2011 UT 38

**In the Matter of the ADOPTION OF BABY E.Z., a minor.**

**J.M.W., III, Appellant,**

v.

**T.I.Z. and C.M.Z., Appellees.**

**No. 20090625.**

Supreme Court of Utah.

July 19, 2011.

Rehearing Denied Sept. 19, 2011.

---

**5.** *See supra* ¶ 23 (emphasis added).

**6.** *See id.* ¶ 24.

**9.** *See supra* ¶ 10.

Joshua K. Peterman, Salt Lake City, for appellant.

Larry S. Jenkins, Lance D. Rich, Salt Lake City, for appellees.

Justice PARRISH, opinion of the Court:

## INTRODUCTION

¶ 1 This is an appeal from a district court order denying a father's motion to intervene in, object to, or dismiss an adoption proceeding involving his biological daughter. The case involves the adoption of Baby E.Z., born on February 10, 2009 in the State of Virginia. The Appellant, John Wyatt III, argues that the federal Parental Kidnapping Prevention Act (the PKPA), 28 U.S.C. § 1738A (2006), deprived the district court of jurisdiction over the adoption proceeding and requires enforcement of a Virginia court order awarding him custody of Baby E.Z. Alternatively, Mr. Wyatt argues that the district court erred when it denied his Motion to Intervene, Objection to Adoption, and Motion to Dismiss the adoption proceeding. We hold that the PKPA applies to adoption proceedings, but that Mr. Wyatt waived any claim under the PKPA by failing to raise the statute below. We also hold that Mr. Wyatt failed to timely assert his parental rights under Utah law and, therefore, the district court correctly denied his motion.

## BACKGROUND

### I. FACTS AND PROCEDURAL HISTORY

¶ 2 As the result of a relationship with Mr. Wyatt, Emily Colleen Fahland (the Birth

Mother) became pregnant with Baby E.Z. in 2008. The Birth Mother and Mr. Wyatt, both residents of Virginia, were never married and Baby E.Z. was born on February 10, 2009 in Woodbridge, Virginia. Prior to the birth of Baby E.Z., the Birth Mother decided to relinquish the child for adoption and retained Act of Love/Alternative Options to assist her with the adoption process.

¶ 3 On February 12, 2009, the Birth Mother relinquished her parental rights in Baby E.Z. and consented to the adoption. This allowed the adoption agency to place Baby E.Z. with Appellees, the prospective adoptive parents (the Prospective Parents).

¶ 4 On February 17, 2009, the Prospective Parents received approval from the administrator of the Interstate Compact on Child Placement to travel to Utah with Baby E.Z. The next day, Mr. Wyatt initiated custody and visitation proceedings in a Virginia Juvenile and Domestic Relations Court (the Virginia court).

¶ 5 On February 23, 2009, while the Virginia custody and visitation action was proceeding, the Prospective Parents filed a Petition for Adoption in Utah district court. On April 8, 2009, Mr. Wyatt registered as the putative father of Baby E.Z. with the Virginia Putative Father Registry. On April 28, 2009, Mr. Wyatt filed a motion in the Utah court contesting the adoption and requesting permission to intervene. Mr. Wyatt neither raised the PKPA in the Utah district court nor challenged the Utah court's jurisdiction to hear the adoption proceeding. On June 11, 2009, the Utah court denied Mr. Wyatt's motion, holding that he had waived his rights to the child, that he could not intervene, and that his consent to the adoption was not required. It is this district court order that is the subject of this appeal.

¶ 6 Subsequently, on December 11, 2009, the Virginia court issued an order granting Mr. Wyatt custody of Baby E.Z. (the Virginia Order).[1] Relying on the PKPA, the Virginia court determined that it had exclusive jurisdiction to determine custody of Baby E.Z.

## II. UTAH'S ADOPTION LAWS AND THE PKPA

¶ 7 The Utah legislature has enacted strict requirements for unmarried birth fathers who seek to prevent adoption of their children. *See, e.g.,* UTAH CODE ANN. § 78B–6–121(3) (Supp.2010) ("[C]onsent of an unmarried biological father is not required unless, prior to the time the mother executes her consent for adoption or relinquishes the child for adoption, the unmarried biological father [commences a paternity action in a Utah district court]."). This court has recently upheld these requirements. *See J.S. v. P.K. (In re Adoption of I.K.),* 2009 UT 70, ¶ 8, 220 P.3d 464 ("Under Utah law, an unmarried biological father must establish his parental rights by strictly complying with certain statutory requirements."); *H.U.F. v. W.P.W,* 2009 UT 10, ¶¶ 28–38, 203 P.3d 943 (affirming district court's ruling that a putative father waived his rights to contest adoption because he failed to comply with Utah's requirements). This case is unique, however, because we are being called upon for the first time to address a Utah adoption proceeding in connection with the federal PKPA, 28 U.S.C. § 1738A (2006).

¶ 8 To provide proper context, we briefly describe the PKPA and its state law precursor, the Uniform Child Custody Jurisdiction Act (UCCJA). The UCCJA was promulgated in 1968 by the National Conference of Commissioners on Uniform State Laws in response to "child snatching." *See* UCCJA prefatory note. Child snatching occurs when a noncustodial parent who has not prevailed in a custody proceeding in one state abducts his or her children and transports them across state lines to seek a more favorable result in another forum. *See id.* Child snatching was widespread in part because, unlike other judicial orders, custody determinations are not subject to the Full Faith and Credit Clause of the United States Constitution. *See id.* Constitutional full faith and credit attaches only to "final" judgments, and custody determinations are typically modifi-

---

1. Although the Virginia Order does not appear in the record, we take judicial notice of it pursuant to rule 201(b) of the Utah Rules of Evidence.

able, nonfinal orders. *See id.* Thus, absent legislation providing otherwise, the possibility of modification of custody decrees provided incentive for a parent unwilling to accept an adverse judgment in one state to seek a more favorable custody determination in another. *See id.*

¶ 9 The UCCJA was a piece of model legislation that sought to remedy this problem by extending full faith and credit to state custody decrees. *See id.* The statute largely had this effect, but only in those states in which it was adopted. States that had not adopted the UCCJA became havens for child snatchers seeking favorable custody determinations. *See, e.g.,* Roger M. Baron, *Federal Preemption in the Resolution of Child Custody Jurisdiction Disputes,* 45 ARK. L.REV. 885, 889–90 (1993). Seeking to fill this void, Congress passed the PKPA. *See id.* at 890. The PKPA had as a primary goal the extension of full faith and credit to all state custody determinations. But the statute had broader goals as well. Congress recognized that interstate controversies over child custody should be minimized so as to better foster stable home environments and secure family relationships for children. *See* PKPA of 1980, Pub.L. No. 96–611, § 7(c)(1), (3)-(5), 94 Stat. 3569, 3569. To this end, the PKPA provided clear jurisdictional rules intended to identify the jurisdiction in the best position to decide the merits of a child custody case. Mr. Wyatt argues that the PKPA applies here.

## STANDARD OF REVIEW

¶ 10 "Whether a trial court has subject matter jurisdiction presents a question of law, which this Court reviews under a correction of error standard...." *Xiao Yang Li v. Univ. of Utah,* 2006 UT 57, ¶ 7, 144 P.3d 1142 (internal quotation marks omitted). Similarly, a "district court's decision to grant a motion to dismiss presents a question of law that we review for correctness." *Citizens for Responsible Transp. v. Draper City,* 2008 UT 43, ¶ 8, 190 P.3d 1245. "We also review standing and intervention issues under a correctness standard." *J.S. v. P.K. (In re Adoption of I.K.),* 2009 UT 70, ¶ 7, 220 P.3d 464.

## ANALYSIS

¶ 11 Mr. Wyatt raises two primary arguments. First, he argues that the PKPA, which he raises for the first time on appeal, deprives Utah courts of subject matter jurisdiction over the adoption proceeding involving Baby E.Z. and requires enforcement of the Virginia Order awarding him custody. Mr. Wyatt alternatively argues that the Utah court erred in denying his motion to intervene in, object to, or dismiss the adoption proceeding.

¶ 12 The Prospective Parents argue that the PKPA does not apply to adoption proceedings and that, in any event, Mr. Wyatt waived his jurisdictional argument under the PKPA by failing to raise it in the district court. They further argue that the district court properly denied Mr. Wyatt's challenge to the adoption proceeding because Mr. Wyatt failed to timely establish parental rights in Baby E.Z.

¶ 13 We hold that the PKPA applies to adoption proceedings, but that it does not divest the district court of subject matter jurisdiction. Therefore, Mr. Wyatt's failure to raise the PKPA in the district court precludes its consideration on appeal. We further hold that the district court properly applied Utah law in concluding that Mr. Wyatt forfeited his right to contest the adoption by failing to comply with the requirements of Utah law. We therefore affirm.

I. BY ITS PLAIN LANGUAGE, THE PKPA APPLIES TO ADOPTION PROCEEDINGS BECAUSE THEY INVOLVE A "CUSTODY DETERMINATION"

¶ 14 The prospective parents argue that the PKPA does not apply to adoption proceedings and that it therefore cannot deprive Utah courts of jurisdiction over their adoption petition. In relevant part, the PKPA states:

A court of a State shall not exercise jurisdiction in *any* proceeding for a custody or visitation determination commenced during the pendency of a proceeding in a court of another State where such court of that

other State is exercising jurisdiction consistently with the provisions of this section to make a custody or visitation determination.

28 U.S.C. § 1738A(g) (2006) (emphasis added).

¶ 15 Whether the PKPA applies to adoptions is an issue of statutory construction. "Under our established rules of statutory construction, we look first to the plain meaning of the pertinent language in interpreting [the statute]. . . ." *Fla. Asset Fin. Corp. v. Utah Labor Comm'n*, 2006 UT 58, ¶ 9, 147 P.3d 1189. "Our overall goal is to give effect to the legislative intent, as evidenced by the [statute's] plain language, in light of the purpose the statute was meant to achieve." *Id.* (alteration in original) (internal quotation marks omitted). Further, we assume the legislative body "used each term advisedly and in accordance with its ordinary meaning." *State v. Jeffs*, 2010 UT 49, ¶ 31, 243 P.3d 1250 (internal quotation marks omitted). Unless we find ambiguity in a statute, we do not look to legislative history or public policy to try to glean the statute's intent. *See Martinez v. Media–Paymaster Plus/Church of Jesus Christ of Latter-Day Saints*, 2007 UT 42, ¶ 47, 164 P.3d 384; *Fla. Asset Fin. Corp.*, 2006 UT 58, ¶ 9, 147 P.3d 1189.

¶ 16 Whether the PKPA applies here depends on whether the Prospective Parents' adoption petition is encompassed by the phrase "*any* proceeding for a custody ... determination." *See* 28 U.S.C. § 1738A(g) (emphasis added). The PKPA defines "custody determination" broadly, as "a judgment, decree, or other order of a court providing for the custody of a child, and includes permanent and temporary orders, and initial orders and modifications." *Id.* § 1738A(b)(3). And the PKPA defines "physical custody" as "actual possession and control of a child." *Id.* § 1738A(b)(7). Reading the phrase "any proceeding for a custody determination" together with the definitions of "custody determination" and "physical custody," we conclude that the phrase "any proceeding for a custody determination" includes all proceedings that establish who will have "actual possession and control of a child."

¶ 17 In light of this conclusion, adoption proceedings fall within the "any proceeding for a custody determination" provision of the PKPA. Adoption proceedings are replete with court-made determinations of who will have "actual possession and control of" a child. Under the Utah Code, a final adoption decree divests a natural parent of all parental rights, including the right of custody, and bestows those parental rights, including the right of custody, on the adoptive parent or parents. *See* UTAH CODE ANN. § 78B–6–137 (2008) ("[I]f satisfied that the interests of the child will be promoted by the adoption, [the court] shall enter a final decree of adoption declaring that the child is adopted by the adoptive parent or parents and shall be regarded and treated in all respects as the child of the adoptive parent or parents."); *id.* § 78B–6–138(1) (Supp. 2010) ("A pre-existing parent of an adopted child is released from all parental duties toward and all responsibilities for the adopted child, including residual rights, and has no further rights with regard to that child . . . ."). Under this rubric, when considering an adoption petition, a court must necessarily determine who will have "actual possession and control of [the] child." Put another way, an adoption proceeding works the ultimate custody determination by severing any ties between a child and his or her biological parents and vesting permanent custody—both "physical" and "legal"—of the child with the adoptive parents.

¶ 18 Even adoption proceedings that do not result in a final adoption decree often implicate custody of the child. For example, Utah's adoption statutes contemplate that custody determinations will be made in the course of an adoption proceeding, even perhaps before a final decree is issued. *See id.* § 78B–6–134(1) (2008) ("*Except as otherwise provided by the court*, once a petitioner has received the adoptee into his home and a petition for adoption has been filed, the petitioner is entitled to the custody and control of the adoptee . . . ." (emphasis added)). Similarly, the Uniform Adoption Act (the UAA), upon which many states have modeled their adoption statutes, provides several such

instances. For example, section 3–204 states that in a contested adoption, the "court shall make an interim order for custody of a minor adoptee according to the best interest of the minor." UAA § 3–204 (1994). The UAA also states that, in the event the court "set[s] aside" the parent's consent, "the court shall order the return of the minor to the custody of the individual and dismiss a proceeding for adoption." *Id.* § 2–408(d). These actions cannot be viewed as anything other than "custody determinations" under the PKPA's broad definition of that phrase.

¶ 19 We find significance in Congress' use of the broad language "any proceeding for a custody or visitation determination." 28 U.S.C. § 1738A(g). Had Congress intended the PKPA to apply only to a narrow subset of all possible "custody determinations," it could have chosen either to list those proceedings included or, at least, enumerate those excluded. It did neither. We therefore conclude that, under the plain language of the PKPA, the adoption proceeding below involves a "custody determination" subject to the PKPA.[2]

¶ 20 Our interpretation is consistent with the vast majority of courts to have considered the issue. Courts are nearly unanimous in holding that an adoption proceeding is a "custody determination" subject to either the PKPA, the UCCJA, or both.[3] Courts generally base this holding on a plain language reading of the statutes. *See, e.g., In re Custody of K.R.*, 897 P.2d 896, 899–900 (Colo. App.1995) ("The majority of jurisdictions that have addressed the issue have concluded that adoption proceedings are 'custody proceedings' because they inherently determine custody issues."); *Gainey v. Olivo*, 258 Ga. 640, 373 S.E.2d 4, 6 (1988) ("Viewing the phrase custody proceeding in a broad sense ... we readily conclude that adoptions are encompassed therein." (internal quotation marks omitted)); *In re Adoption of Baby Girl B.*, 19 Kan.App.2d 283, 867 P.2d 1074, 1078 (1994) (noting that the definition of "custody proceeding" in the UCCJA "is broad enough to include adoption proceedings"); *McCulley v. Bone*, 160 Or.App. 24, 979 P.2d 779, 786–87 (1999) ("Although neither Oregon's UCCJA nor the PKPA specifically addresses adoption proceedings, adoptions fall within their provisions because those proceedings result in 'custody determinations.' ").[4] These courts

---

**2.** In an attempt to refute our plain language analysis, Justice Lee engages in an analysis of the "linguistic" context of the use of the word "custody." As part of this analysis, Justice Lee notes that "[t]he word 'custody' is some ten times more likely to collocate with the word 'divorce' than with the word 'adoption' in contemporary usage." *Infra* ¶ 88. Unless this linguistic "context" is placed in its proper context, it is of little analytical or persuasive value.

Justice Lee assumes that the words "adoption" and "divorce" are used with equal frequency. Indeed, the fact that the word "custody" is ten times more likely to occur with the word "divorce" than with the word "adoption" may prove only that there are ten times as many divorces than there are adoption proceedings. If the word "car" is ten times more likely to co-occur with the word "red" than with the word "purple," it would be ludicrous to conclude from this data that a purple car is not a "car." Yet this is exactly what Justice Lee has done. This type of analysis is of little analytical or persuasive value.

**3.** As discussed above, the PKPA and the UCCJA were enacted to achieve substantially identical goals and the statutes contain nearly identical definitions of "custody determination." The UCCJA's definition is as follows: " '[C]ustody determination' means a court decision and court orders and instructions providing for the custody of a child, including visitation rights; it does not

include a decision relating to child support or any other monetary obligation of any person." UNIF. CHILD CUSTODY & JURISDICTION ACT § 2(2) (1968). The PKPA defines "custody determination" as "a judgment, decree, or other order of a court providing for the custody of a child, and includes permanent and temporary orders, and initial orders and modifications." 28 U.S.C. § 1738A(b)(3).

**4.** *See also Ex Parte D.B. and T.B.*, 975 So.2d 940, 946 (Ala.2007) (applying the PKPA to an interstate adoption custody dispute); *J.D.S. v. Franks*, 182 Ariz. 81, 893 P.2d 732, 738–39 (1995) (stating that the UCCJA and the PKPA apply to adoption proceedings); *Souza v. Superior Court*, 193 Cal.App.3d 1304, 238 Cal.Rptr. 892, 895 (1987) ("[A] stepparent adoption, with its potential for completely terminating the natural father's custodial rights, is a custody-determining procedure" subject to the UCCJA and the PKPA.); *In re B.B.R.*, 566 A.2d 1032, 1041 (D.C.1989) (holding that a petition for adoption is a proceeding in pursuance of a "custody determination" for purposes of the PKPA); *Noga v. Noga*, 111 Ill.App.3d 328, 67 Ill.Dec. 18, 443 N.E.2d 1142, 1145 (1982) (holding that an adoption is a custody proceeding within the scope of the UCCJA); *In re Adoption of Baby Girl B.*, 867 P.2d at 1077 (applying the UCCJA to an adoption proceeding because "[w]ho will or will not have custody of a

have found it unnecessary to delve into the legislative history of the statutes. This suggests that, like us, they too found the plain language of the PKPA to be unambiguous.

¶ 21 Our interpretation is bolstered by the fact that the prospective parents do not even bother to make a plain language argument that adoption proceedings are not "custody determinations" as that term is defined in the PKPA. In fact, they appear to concede that a final adoption decree is "the ultimate custody determination," but argue that we should go straight to the intent of the PKPA. They argue that the statute "was not intended to apply in adoption proceedings." But, as noted above, we must begin with the plain language of the statute and can look to intent only if we conclude the statute's language is ambiguous. Because the statutory language is clear, we do not address the prospective parents' intent arguments.

¶ 22 Our plain language interpretation finds further support in the statute's stated goals and purposes. To be sure, as the prospective parents point out, the principal impetus for the statute was rampant "child snatching" by noncustodial parents. *See Thompson v. Thompson,* 484 U.S. 174, 180, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988). As such, one of the PKPA's stated purposes is to "deter interstate abductions and other unilateral removals of children undertaken to obtain custody and visitation awards." PKPA of 1980, Pub.L. No. 96–611, § 7(c)(1), (3)-(5), 94 Stat. 3569, 3569. But the statute has broader goals as well, including: minimization of "interstate controversies over child custody;" avoidance of "jurisdictional competition and conflict between State courts in matters of child custody and visitation which have in the past resulted in the shifting of children from State to State with harmful effects on their well-being;" ensuring "that a determination of custody and visitation is rendered in the State which can best decide the case in the interest of the child;" and facilitation of "the enforcement of custody and visitation decrees of sister states." *Id.* §§ 7(c)(1), (3)-(5). Not only are these purposes furthered when the statute is applied to adoption proceedings, they would be frustrated if it were not.

¶ 23 Finally, our interpretation finds support in the fact that Congress has revisited the PKPA to make substantive amendments twice since its enactment, but has not changed the definition of "custody determination" to exclude adoption. *See* Act of Nov. 12, 1998, Pub.L. No. 105–374, § 1, 112 Stat 3383, 3383; Violence Against Women Act of 2000, Pub.L. No. 106–386, div. B, § 1303(d), 114 Stat. 1491, 1512. The first amendment occurred in 1998, when Congress changed twelve subsections or paragraphs and added a subsection. *See* Act of Nov. 12, 1998, § 1. At the time of that amendment, a number of courts had already determined that adoption proceedings were "custody determinations" subject to the PKPA. If these courts were incorrectly interpreting the statute, we presume Congress would have taken the opportunity to correct these misinterpretations. It did not. Congress surely is cognizant of the fact that parties rely on judicial interpretations of legislation and, if the interpretation is in error, Congress ordinarily will take steps to either correct the legislation or provide additional guidance to the courts. Here, it did neither.

child is also at issue in adoption proceedings"); *Moore v. Asente,* 110 S.W.3d 336, 349 (Ky.2003) (concluding "that the UCCJA, which governs child custody proceedings, applies to jurisdictional conflicts in adoption proceedings because the result of an adoption is a transfer of custody"); *Foster v. Stein,* 183 Mich.App. 424, 454 N.W.2d 244, 247 (1990) (concluding that adoption proceedings are included within the UCCJA's definition of "custody proceeding"); *In re Adoption of Child by T.W.C. & P.C.,* 270 N.J.Super. 225, 636 A.2d 1083, 1086 (N.J.Super.Ct.App.Div.1994) (applying the UCCJA to adoption proceeding because the term "custody proceeding" as used in the UCCJA applies to disputes between natural parents and adoptive parents); *In re L.S.,* 1997 OK 109, ¶ 15, 943 P.2d 621, (Okla.1997) (holding that an adoption proceeding is a "custody proceeding" within the scope of the UCCJA); *In re Adoption of B.E.W.G.,* 379 Pa.Super. 264, 549 A.2d 1286, 1290 (1988) (applying the UCCJA to an adoption proceeding); *Doe v. Baby Girl,* 376 S.C. 267, 657 S.E.2d 455, 463 (2008) (applying the PKPA to an interstate adoption proceeding). *But see Johnson v. Capps (In re Termination of Parental Rights of Johnson),* 415 N.E.2d 108, 110 (Ind.Ct.App.1981) (holding that a termination of parental rights action is not a custody proceeding); *Williams v. Knott,* 690 S.W.2d 605, 608–09 (Tex.App.1985) (same).

¶ 24 We hold that, under its plain language, the PKPA applies to adoption proceedings. In so doing, we join the overwhelming majority of courts that have addressed the issue and reached the same conclusion.

## II. MR. WYATT WAIVED APPLICATION OF THE PKPA BECAUSE THE STATUTE DOES NOT DIVEST THE DISTRICT COURT OF SUBJECT MATTER JURISDICTION

¶ 25 Having determined that the PKPA applies to adoptions, we next consider whether Mr. Wyatt's argument under the PKPA is properly before the court. Mr. Wyatt asserts, for the first time on appeal, that the PKPA deprives Utah courts of jurisdiction over the adoption petition and requires enforcement of the Virginia Order. " '[I]n order to preserve an issue for appeal the issue must be presented to the trial court in such a way that the trial court has an opportunity to rule on that issue.' " *Pratt v. Nelson,* 2007 UT 41, ¶ 15, 164 P.3d 366 (quoting *Brookside Mobile Home Park, Ltd. v. Peebles,* 2002 UT 48, ¶ 14, 48 P.3d 968). We therefore will generally not consider arguments that litigants have failed to raise in the proceedings below. *State v. Holgate,* 2000 UT 74, ¶ 11, 10 P.3d 346. One exception to the preservation requirement is subject matter jurisdiction. Because subject matter jurisdiction goes to the heart of a court's authority to hear a case, *Crump v. Crump,* 821 P.2d 1172, 1174–75 (Utah Ct.App.1991), it is not subject to waiver and may be raised at any time, even if first raised on appeal. *See, e.g., Johnson v. Johnson,* 2010 UT 28, ¶ 10, 234 P.3d 1100.

¶ 26 Mr. Wyatt acknowledges that he failed to raise the PKPA in the district court, but maintains that he is nevertheless entitled to raise it on appeal because it goes to the issue of subject matter jurisdiction. Therefore, we must address whether the PKPA deprives the Utah courts of subject matter jurisdiction over adoption petitions in cases such as this. The PKPA states that

[a] court of a State shall not exercise jurisdiction in any proceeding for a custody or visitation determination commenced during the pendency of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with the provisions of this section to make a custody ... determination.

28 U.S.C. § 1738A(g). Mr. Wyatt argues that this provision deprives Utah courts of subject matter jurisdiction over the adoption petition.

¶ 27 In support of his argument, Mr. Wyatt relies on a Utah Court of Appeals opinion, *Curtis v. Curtis,* 789 P.2d 717 (Utah Ct.App.1990). In *Curtis,* a Utah court entered a divorce and custody decree that was subsequently modified in favor of the father by a Mississippi court. *Id.* at 718–19. A Utah district court granted the father's motion to enforce the Mississippi order. *Id.* at 720. The mother appealed, and although she did not raise the PKPA either below or on appeal, the court of appeals sua sponte applied it and reversed the Utah district court, holding that "Mississippi did not have subject matter jurisdiction to enter its modification orders." *Id.* at 720–21, 726.

¶ 28 We disagree with and overrule *Curtis* to the extent that it suggests that the PKPA strips Utah courts of subject matter jurisdiction, rather than simply limiting the circumstances under which such jurisdiction may be exercised.[5]

¶ 29 We have recently clarified the concept of subject matter jurisdiction. In *Johnson v. Johnson,* we considered whether the existence of a valid marriage was a prerequisite to a district court's subject matter jurisdiction over a divorce action. 2010 UT 28, ¶ 1, 234 P.3d 1100. In that case, the district court had entered a divorce decree terminating the marriage of Neldon and Ina Johnson. *Id.* Mr. Johnson subsequently filed a motion to vacate the decree, arguing that because he and Ms. Johnson had never actually been married, the district court was without subject matter jurisdiction to enter the decree.

---

5. We are not bound by *Curtis* or any other Utah Court of Appeals cases that have addressed this issue. *See, e.g., Barton v. Barton,* 2001 UT App 199, ¶ 12, 29 P.3d 13; *Crump,* 821 P.2d at 1173–75.

*Id.* ¶ 3. We rejected such a broad formulation of subject matter jurisdiction, holding that "[t]he concept of subject matter jurisdiction does not embrace all cases where the court's competence is at issue." *Id.* ¶ 9.

 ¶ 30 A court has subject matter jurisdiction when it has "the authority . . . to decide the case." *Id.* ¶ 8 (internal quotation marks omitted). The Utah Constitution vests the judicial power of the state in the "supreme court, in a trial court of general jurisdiction known as the district court, and in such other courts as the Legislature by statute may establish." UTAH CONST. art. VIII, § 1. It further provides that "[t]he district court shall have original jurisdiction in *all* matters except as limited by this constitution or by statute." *Id.* art. VIII, § 5 (emphasis added). Consistent with these constitutional provisions, Utah statute gives district courts "original jurisdiction in all matters civil and criminal, not excepted in the Utah Constitution and not prohibited by law." UTAH CODE ANN. § 78A–5–102(1) (Supp.2010).

¶ 31 "[T]he concept of subject matter jurisdiction relates to 'the relationship between the claim and the forum that allows for the exercise of jurisdiction.'" *Johnson,* 2010 UT 28, ¶ 9, 234 P.3d 1100 (quoting *Chen v. Stewart,* 2004 UT 82, ¶ 35, 100 P.3d 1177). And because parties can raise subject matter jurisdiction at any time, even for the first time on appeal, we have limited the concept of subject matter jurisdiction to those cases in which the court lacks authority to hear a class of cases, rather than when it simply lacks authority to grant relief in an individual case. *Id.* ¶ 10. In *Johnson,* because district courts, as courts of general jurisdiction, had "the authority to adjudicate divorces," we held that the district court had subject matter jurisdiction to adjudicate Ms. Johnson's petition for divorce even though she and Mr. Johnson had never been married. *Id.* ¶¶ 12–13.

¶ 32 We reached a similar result in *Chen,* 2004 UT 82, 100 P.3d 1177. There, we held that a challenge to a court's authority to appoint an interim CEO in the context of a company dispute did not raise an issue of subject matter jurisdiction. *Id.* ¶¶ 33–41.

Because the district court clearly had the authority to hear the underlying dispute, the challenge was more properly characterized as one directed to the court's exercise of its equitable powers. *Id.* ¶ 39. And in *Career Service Review Board v. Utah Department of Corrections,* we held that the Career Service Review Board did not lose subject matter jurisdiction over a career service employee as a result of the factual intricacies of the case because the Board clearly had the statutory authority to review the matter. 942 P.2d 933, 941–42 (Utah 1997).

 ¶ 33 The lesson from these cases is clear. In determining whether a court has subject matter jurisdiction, we focus on whether the court has authority over the general class of cases to which the particular case at issue belongs, rather than on the specific facts presented by any individual case.

 ¶ 34 Here, as in *Johnson,* the question is whether the district court has authority to adjudicate the general class of cases to which this case belongs. And, as in *Johnson,* we answer the question in the affirmative. "Custody or visitation" proceedings fall within the category of cases over which Utah district courts have original subject matter jurisdiction pursuant to the Utah Constitution and section 78A–5–102(1) of the Utah Code. Thus, Utah district courts clearly have subject matter jurisdiction over adoption proceedings as a class of cases.

 ¶ 35 The PKPA does not divest Utah courts of this subject matter jurisdiction because it does not evidence an intent by Congress to withdraw state subject matter jurisdiction over a class of cases. Laws governing subject matter jurisdiction are generally expressed in clear terms. *See Henderson ex rel. Henderson v. Shinseki,* ─── U.S. ───, 131 S.Ct. 1197, 1203, 179 L.Ed.2d 159 (2011) (stating that to determine whether a statute is "jurisdictional," the Court "look[s] to see if there is any clear indication that Congress wanted the rule to be jurisdictional" (internal quotation marks omitted)); *see also* UTAH CODE ANN. § 78A–6–103(1) (conferring on juvenile courts "exclusive original jurisdiction" over certain of-

fenses committed by persons under the age of eighteen); 28 U.S.C. § 1338(a) (2006) (conferring on federal district courts "original jurisdiction" over patent and copyright cases and specifying that "[s]uch jurisdiction shall be exclusive of the courts of the states"). Had Congress intended to strip state courts of subject matter jurisdiction over certain adoption cases, it could have clearly expressed its intent to do so. But it did not. Instead, the statutory language prohibits only the "exercise" of jurisdiction in certain circumstances. In other words, the plain language of the PKPA indicates that even though a state court may have subject matter jurisdiction under state law to make a custody determination, it should refrain from exercising that jurisdiction if another state is in the process of making a custody determination with respect to the same child. In short, although the PKPA, when properly raised, may limit the circumstances under which a state court may exercise its jurisdiction, it does not divest a court of its underlying subject matter jurisdiction.

¶ 36 Policy considerations also militate in favor of our interpretation. Because subject matter jurisdiction goes to the court's authority to hear a case, "courts have an independent obligation to ... raise and decide jurisdictional questions that the parties either overlook or elect not to press." *Henderson*, 131 S.Ct. at 1202. Reading the PKPA to divest state courts of subject matter jurisdiction over certain adoptions would require state courts to undertake a sua sponte inquiry to determine whether a proceeding involving the same child had been initiated consistent with the PKPA in another state. *See* 28 U.S.C. § 1738A(g). And such a determination would turn on the existence or nonexistence of specific facts that may not be readily ascertainable. The factual issues upon which jurisdiction turns are difficult enough to resolve when raised and argued by the parties; when not raised, the court would be forced to assess in a vacuum whether the PKPA's jurisdictional test had been met.

¶ 37 The result of all of this would be a dramatic increase in the uncertainty of interstate adoptions. A decision rendered by a court without subject matter jurisdiction is legally void at its inception. *See, e.g., Van Der Stappen v. Van Der Stappen*, 815 P.2d 1335, 1337 (Utah Ct.App.1991) ("[A] judgment is void when entered by a court that lacks subject matter jurisdiction over the controversy, and must be set aside...."). Because a void judgment may be collaterally attacked at any time after the judgment is entered, the possibility that a putative father could one day appear and claim that he had initiated a prior custody proceeding in another state would jeopardize the finality of countless interstate adoptions. And if the putative father's claim were proven true, the previously entered adoption would be rendered void. We do not believe Congress could possibly have intended such a result.

¶ 38 Other important attributes of the PKPA also support our conclusion that the PKPA was never intended to strip state courts of subject matter jurisdiction. Significantly, the PKPA is not included with other federal statutes governing judicial jurisdiction, but was placed as an addendum to the full faith and credit statute, 28 U.S.C. § 1738. The heading of the statute is "[f]ull faith and credit given to child custody determinations." And the United States Supreme Court has noted that a central purpose of the PKPA is to "extend the requirements of the Full Faith and Credit Clause to custody determinations." *Thompson v. Thompson*, 484 U.S. 174, 183, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988). In short, the PKPA was intended primarily as a full faith and credit statute. This is significant because, unlike claims of subject matter jurisdiction, full faith and credit claims are subject to waiver if not raised in a timely fashion. *See O'Dea v. Olea*, 2009 UT 46, ¶ 20, 217 P.3d 704 (declining to address a full faith and credit claim because the district court was not "alerted" to it).

¶ 39 We hold that the PKPA does not operate to divest the district courts of their constitutional authority to decide adoption cases. As a result, the PKPA is subject to waiver and Mr. Wyatt waived its application here by failing to raise it in the district court.

## III. BECAUSE MR. WYATT FAILED TO TIMELY ASSERT HIS PARENTAL RIGHTS, HIS CONSENT TO THE ADOPTION WAS NOT REQUIRED

¶ 40 Mr. Wyatt argues that the trial court erred when it concluded he had waived the right to refuse to consent to the adoption of Baby E.Z. We disagree. The Utah Legislature has enacted strict requirements for unmarried birth fathers who seek to prevent adoption of their children. *See* UTAH CODE ANN. § 78B–6–122(2) (Supp.2010). A father may preserve his right to withhold consent if he strictly complies with the following three statutory requirements. First, he must show that he "did not know, and through the exercise of reasonable diligence could not have known, before the time the mother executed a consent to adoption or relinquishment of the child for adoption, that a qualifying circumstance existed." [6] *Id.* § 78B–6–122(1)(c)(i)(A). Second, *prior to the mother's consent to adoption,* the father must have "fully complied with the requirements to establish parental rights in the child, and to preserve the right to notice of a proceeding in connection with the adoption of the child," of the state where the child was conceived or the last state where he knew that the mother resided. *Id.* § 78B–6–122(1)(c)(i)(B). Finally, the father must demonstrate "a full commitment to his parental responsibilities." *Id.* § 78B–6–122(1)(c)(i)(C). Unless an unmarried biological father has "strictly compl[ied]" with these statutory requirements, the father "is considered to have waived and surrendered any right in relation to the child, including the right to ... consent, or refuse to consent, to the adoption of the child." *Id.* § 78B–6–122(2).

¶ 41 Applying this framework here, even if we assume that Mr. Wyatt has demonstrated a commitment to his parental responsibilities and did not know, and should not have known, of a qualifying circumstance, he still has not preserved his right because he failed to take the steps required to establish his parental rights under Virginia law until after the Birth Mother relinquished her rights in Baby E.Z. and consented to the adoption.

¶ 42 The Birth Mother relinquished her parental rights and consented to the adoption of Baby E.Z. on February 12, but Mr. Wyatt did not initiate his custody action in Virginia until six days later, on February 18. Similarly, Mr. Wyatt did not file with Virginia's Putative Father Registry until April 8. And Mr. Wyatt does not contend that he took any other steps in Virginia to establish his paternity before the Birth Mother executed her consent. As a result, the district court correctly concluded that Mr. Wyatt "waived and surrendered any right in relation to" Baby E.Z. by failing to "fully and strictly comply with the requirements of" Utah law.[7] *Id.* § 78B–6–122(2).

¶ 43 Mr. Wyatt argues that enforcing the requirement that a father take action to assert paternity before the mother's consent or relinquishment "would result in an unconstitutional result." However, there is no evidence whatsoever that Mr. Wyatt preserved this constitutional challenge to Utah law by raising this (or any other) constitu-

---

6. Qualifying circumstances are those circumstances that would put a father on notice of his obligation to comply with Utah law. Specifically, a "qualifying circumstance" exists if, between the time of conception and the mother's consent to adoption or relinquishment of the child for adoption, (1) either the mother or child temporarily or permanently resided in Utah; (2) the mother intended to give birth to the child in Utah; (3) the child was born in Utah; or (4) the mother intended to place the child for adoption in, or under the laws of, Utah. UTAH CODE ANN. § 78B–6–122(1)(a).

7. There are two other methods under which an unmarried father may preserve his right to refuse consent to adoption of his child. Both of these methods require the father to, among other things, timely initiate a paternity proceeding in a Utah district court. UTAH CODE ANN. § 78B–6–121(3) (requiring a father to, among other things, initiate a proceeding in a Utah district court to establish paternity before the mother executes her consent for adoption); *id.* § 78B–6–122(1)(c)(ii) (requiring a father aware of a qualifying circumstance to, among other things, initiate a paternity proceeding in a Utah district court either before the later of the time the mother executes her consent or twenty days after becoming aware of the qualifying circumstance). Mr. Wyatt does not argue that he has complied with either of these methods. Even if he had, his argument would fail because there is nothing in the record to indicate that Mr. Wyatt sought to establish paternity in Utah within the deadlines.

tional argument in the district court. Consequently, Mr. Wyatt waived any constitutional challenges to Utah's adoption scheme. *E.g.,* *State v. Holgate,* 2000 UT 74, ¶ 11, 10 P.3d 346.

## CONCLUSION

¶ 44 The PKPA applies to adoption proceedings. It does not, however, strip the Utah courts of subject matter jurisdiction over the adoption of Baby E.Z. Because Mr. Wyatt did not raise the PKPA below, he waived his argument that the district court should not have exercised its jurisdiction over the adoption proceeding involving Baby E.Z. The district court correctly concluded that Mr. Wyatt failed to timely assert his parental rights in either Utah or Virginia prior to the Birth Mother's relinquishment of her parental rights in Baby E.Z. and thus waived all rights to contest the adoption. We therefore affirm the order of the district court.

¶ 45 Chief Justice DURHAM and Justice NEHRING concur in Justice PARRISH's opinion.

Associate Chief Justice DURRANT, concurring in part with Justice PARRISH and concurring in part with Justice LEE:

¶ 46 I concur in the majority's conclusion that the PKPA does not divest the district court of subject matter jurisdiction and in the additional points concerning that issue offered in Justice Lee's concurring opinion. I also concur in Justice Lee's conclusion that the PKPA does not apply to adoption proceedings.

¶ 47 I write separately, however, to express two points of concern with the way in which Justice Lee reaches the conclusion that the PKPA does not apply to adoptions. First, I share the majority's concern about the use of computer-generated linguistic analyses when interpreting statutory language. I therefore disagree with Justice Lee's use of such sources in his attempt to interpret the term "custody" as it is used in the PKPA.

¶ 48 Second, I disagree with Justice Lee's statement that "the language and structure of the PKPA remove any ambiguity regarding the meaning of custody proceedings covered by the act."[1] Instead, I believe that the term "custody" is susceptible to two reasonable interpretations even when the term is viewed within the language and structure of the PKPA. Indeed, in relying on what they deem to be the "plain language" of the PKPA, the majority and Justice Lee reach contradictory conclusions on the meaning of the term custody—the majority interpreting the term to include adoptions and Justice Lee interpreting the term to exclude adoptions. Because I believe that both of these interpretations are reasonable, I view the PKPA's use of the term "custody" as ambiguous.

¶ 49 Despite this point of disagreement, I feel that the sources relied upon by Justice Lee—including the PKPA's language and structure, legislative history, and express statement of purpose—indicate that Congress likely intended the PKPA to apply only to modifiable custody determinations, and not to adoptions. I further agree with Justice Lee's use of the well-settled canon of construction, commonly referred to as the "clear statement rule."[2] This canon dictates that when we are faced with an ambiguity in a federal statute that implicates traditional state prerogatives, we must read the statute narrowly absent a "clear" and "manifest" intent by Congress.[3] Because the term "custody" is ambiguous and because "the regulation of adoptions and other family affairs is a traditional state prerogative,"[4] I feel that the "clear statement rule" requires us to interpret the term "custody," as it is used in the PKPA, to *not* include adoptions.

¶ 50 Accordingly, despite some points of disagreement, I concur in Justice Lee's conclusion that the PKPA does not relate to adoption proceedings. I do so because, in my view, interpreting the PKPA's use of the

---

1. *Infra* ¶ 113.

2. *See infra* ¶¶ 115–116

3. *See infra* ¶ 116 and accompanying citations.

4. *See infra* ¶ 116

term "custody" to exclude adoption proceedings is the interpretation likely intended by Congress.

Justice LEE, concurring in part and concurring in the judgment:

¶ 51 I agree with the judgment of the court and with much of its analysis, but write separately to identify some points of analytical disagreement and to offer my views on an alternative ground for affirmance. I concur in the majority's conclusions that Wyatt (1) failed to protect his interests as a putative father through strict compliance with the Utah Adoption Act, UTAH CODE ANN. § 78B-6–101, to –104 (2008 & Supp.2010); and (2) did not preserve (and thus forfeited)[1] the argument that the Parental Kidnapping Prevention Act ("PKPA"), 28 U.S.C. § 1738A (2006), divests the district court of its jurisdiction over the adoption in question.

¶ 52 I write separately, however, because I find the majority's rationale for the latter conclusion incomplete. I do not believe that the court's construction of the PKPA follows from our holding in *Johnson v. Johnson*, 2010 UT 28, 234 P.3d 1100, or similar cases. Nor can I agree that the question in this case is "whether the district court has authority to adjudicate the general class of cases to which this case belongs." *Supra* ¶ 34. The dispositive question with respect to forfeiture is not whether the district court has subject-matter jurisdiction over the class of cases governed by the PKPA. Instead, we must determine

what the PKPA means when it directs the state courts not to "exercise jurisdiction in any proceeding for a custody or visitation determination commenced during the pendency of a proceeding in a court of another State." 28 U.S.C. § 1738A(g). The resolution of that question necessarily involves a determination of the type of jurisdiction implicated by this "exercise" formulation—specifically, whether the PKPA's prohibition goes to the competency of the court to hear a class of cases (subject-matter jurisdiction) or to the propriety of the court's exercise of its powers based on the parties' contacts and connections with the forum (personal or territorial jurisdiction). I conclude that the PKPA addresses the latter type of jurisdiction for reasons explained below.

¶ 53 I also write separately to articulate an alternative ground for our holding that Wyatt may not rely on the PKPA to challenge the district court's jurisdiction over the adoption of Baby E.Z.: The Act has no application to adoption proceedings, but extends only to modifiable "custody or visitation determination[s]" such as those made in a divorce context. This is purely a legal question requiring construction of the language of the PKPA. Because both issues have been fully briefed by the parties and both are addressed to the core question whether the PKPA may be employed to divest an adoption court of its jurisdiction, both are proper grounds for our decision.[2] The latter ground (regarding the PKPA's applicability to adop-

---

**1.** Though waiver and forfeiture are often used interchangeably, in precise terms waiver has reference to a knowing, voluntary "relinquishment of a known right," while forfeiture involves a "loss of a right" by mere failure to assert it. *See State v. Pedockie*, 2006 UT 28, ¶ 31, 137 P.3d 716 (internal quotation marks omitted).

**2.** It is worth noting that both issues are also a source of conflict in the courts of other states. Courts are split on whether the "jurisdiction" clause of the PKPA is susceptible to forfeiture. Compare *B.J.P. v. R.W.P.*, 637 A.2d 74, 77–80 (D.C.1994) (PKPA subject to waiver), *and E.N. v. E.S.*, 67 Mass.App.Ct. 182, 852 N.E.2d 1104, 1112 n. 20 & 1115 n. 26 (2006) (same), *with Wambold v. Wambold*, 651 A.2d 330, 332 (Me. 1994) (PKPA is a matter of subject-matter jurisdiction and cannot be waived), *and Moore v. Richardson*, 964 S.W.2d 377, 380–81 (Ark.1998), (same). Without addressing the question of for-

feiture, a number of jurisdictions have held that the PKPA does not implicate subject-matter jurisdiction. *See J.D.S. v. Franks*, 182 Ariz. 81, 893 P.2d 732, 739 (1995); *Glanzner v. Mo. Dep't of Soc. Servs.*, 835 S.W.2d 386, 389 (Mo.Ct.App. 1992); *Hanson v. Leckey*, 754 S.W.2d 292, 294 (Tex.Ct.App.1988). There is a similar split as to the meaning of the Act's reference to "custody proceedings" and whether it extends to adoptions. *Compare Williams v. Knott*, 690 S.W.2d 605, 608–09 (Tex.Ct.App.1985) (PKPA inapplicable to adoption proceedings), *with Ex parte D.B. & T.B.*, 975 So.2d 940, (Ala.2007), *J.D.S.*, 893 P.2d at 738 (Ariz.1995), *Souza v. Superior Court*, 193 Cal.App.3d 1304, 1309–10, 238 Cal.Rptr. 892 (Cal.Ct.App.1987), *In re Custody of K.R.*, 897 P.2d 896, 899–900 (Colo.Ct.App.1995), *In re B.B.R.*, 566 A.2d 1032, 1041 (D.C.1989), *and McCulley v. Bone*, 160 Or.App. 24, 979 P.2d 779, 786–87 (1999).

tion proceedings), moreover, is of much broader significance to future adoption cases, where the issue is sure to be preserved and thus to require a definitive resolution. Because both the nature and the scope of the PKPA are addressed to the core question whether the PKPA divests an adoption court of jurisdiction, both are proper grounds for our decision, and I write separately to explain the basis for my conclusion that the PKPA does not apply to adoptions.

## I. THE PKPA, JURISDICTION, AND WAIVER

¶ 54 I agree with the court's conclusion that Wyatt forfeited any right to rely on the PKPA by failing to raise it below. Wyatt reaches a contrary view based on language that he perceives as "plain"—the notion that the statute speaks of "jurisdiction" and the fact that its "shall not exercise" directive is prohibitive and not merely hortatory.

¶ 55 In my view this analysis begs all of the important questions about the meaning of the language Wyatt deems "plain." The question before us is not whether the PKPA is "jurisdictional," or even whether the provision at issue deals with the exercise of "jurisdiction." On those matters, the statute is plain and the answers (to both questions) are clearly "yes." But those questions merely beg the real one, which is whether subsection (g)'s prohibition on the exercise of "jurisdiction" has reference to the kind of jurisdiction that goes to the competency of the court to hear the class of dispute that is before it (subject-matter jurisdiction) or to the kind of jurisdiction that relates to the propriety of the court's use of its conceded power in light of the parties' contacts and connections with the forum (personal or territorial jurisdiction).[3] In context, I have no doubt that the PKPA's jurisdiction provision is of the latter variety, and thus that it is subject to forfeiture in the same way that an objection to personal jurisdiction would be.

### A. The PKPA's Two–Part Test

¶ 56 The PKPA directs the courts of one state not to "exercise jurisdiction" where a court of another state is "exercising jurisdiction consistently with the provisions of this section to make a custody or visitation determination." 28 U.S.C. § 1738A(g). These provisions require that the court (1) have "jurisdiction under the law of ... [the] State," *Id.* § 1738A(c)(1); and (2) qualify under one of the Act's ordering provisions— e.g., the "home state" analysis, or the "significant connection" and "substantial evidence" tests, *Id.* § 1738A(c)(2)(A), (B). Because both criteria must be satisfied, the existence of state court jurisdiction (whether subject-matter jurisdiction or personal jurisdiction) over the underlying dispute under state law cannot be dispositive. The PKPA addresses itself to circumstances in which two courts possess jurisdiction under their respective state laws. In such circumstances, the Act provides ordering mechanisms for determining which state-court custody determination may be afforded full faith and credit.

¶ 57 The majority focuses its analysis on the contours of subject-matter jurisdiction, asserting that "the question ... is whether the district court has authority to adjudicate the general class of cases to which this case belongs." *See supra* ¶ 33. In the court's view, " '[c]ustody or visitation' proceedings fall within the category of cases over which Utah district courts have original subject-matter jurisdiction." *Supra* ¶ 33. But no one is disputing the district court's subject-matter jurisdiction over "custody or visitation" proceedings generally. The resolution of the waiver question requires a determination *not* of the type of jurisdiction that the district court possesses, but of the type of jurisdiction that the PKPA proscribes.

¶ 58 Consequently, though I agree with the court's conclusion that Wyatt has forfeited his right to rely on the PKPA in this case, I cannot agree that this conclusion is compelled by our decision in *Johnson v. Johnson,* 2010 UT 28, 234 P.3d 1100, or similar cases. In *Johnson* the issue was whether the dis-

---

**3.** *See Stewart v. United States,* 199 F.2d 517, 519 (7th Cir.1952) (noting that "[t]he word 'jurisdiction' is an illusive and uncertain characteriza- tion, depending upon the environment in which it is employed").

trict court had subject-matter jurisdiction over a divorce with respect to a marriage that was never lawfully effected. *Id.* ¶ 5. The court upheld jurisdiction, explaining that Utah "courts of general jurisdiction have the authority to adjudicate divorces" and that such jurisdiction is not invalidated "on the grounds that the 'right involved in the suit did not embrace the relief granted.'" *Id.* ¶ 12 (quoting *Perry v. McLaughlin*, 754 P.2d 679, 682 (Utah Ct.App.1988)). I do not see how that analysis supports the result in this case. It is certainly true that Utah courts have jurisdiction over adoption proceedings. But the issue is not whether the district court in this case ever had subject-matter jurisdiction; everyone agrees that it did. Instead, the question is whether the PKPA's conditions on the exercise of that jurisdiction somehow divest the court of that jurisdiction.

¶ 59 The key question is whether the PKPA's "shall not exercise" formulation references the kind of jurisdiction that goes to the competency of the court to hear the class of dispute that is before it or to the kind of jurisdiction that relates to the propriety of the court's use of its power in light of the parties' connections with the forum. I believe that the PKPA implicates the latter kind of jurisdiction for the reasons outlined below, and would hold for that reason that the PKPA is subject to forfeiture.

### B. Jurisdiction and Forfeiture

¶ 60 Wyatt's view that the PKPA divests the district court of subject-matter jurisdiction rests on the premise that the PKPA declares that state courts "*shall not exercise jurisdiction*" when there is a pending custody determination in another state. 28 U.S.C. § 1738A(g) (emphasis added). The implication is that the "jurisdiction" spoken of in subsection (g) is subject-matter jurisdiction. But Wyatt reaches this conclusion without any analysis of what sort of "jurisdiction" subsection (g) is addressing when it regulates its exercise by the state courts.

¶ 61 The answer to that question ought to be informed by a comparison of subject-matter jurisdiction on the one hand and territorial jurisdiction and some of its cousins (such as venue and abstention) on the other. It

should also be informed by the stated purpose of the PKPA, which is to prescribe the full faith and credit effect of state court custody determinations.

¶ 62 The majority correctly observes that subject-matter jurisdiction goes to the competency of a court to resolve a particular class of dispute. *See Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). This is the quality of subject-matter jurisdiction that presses it outside the capacity of the parties to stipulate to it or waive an objection to it. *Id.; see also Johnson v. Johnson*, 2010 UT 28, ¶ 10, 234 P.3d 1100. There can be no doubt that the state courts have subject-matter jurisdiction over adoptions. No one questions their competency to decide such matters, and thus it makes little sense in this context to read subsection (g)'s directive on jurisdiction as aimed at undermining state court subject-matter jurisdiction.

¶ 63 Indeed, the PKPA does not speak of "jurisdiction" *per se*, but of the "exercise" thereof. That formulation is significant. When the law withdraws subject-matter jurisdiction, it does so in terms clearly aimed at divesting a court of the capacity or power to hear a particular kind of dispute. *See, supra* ¶ 35. By instead directing that courts not "exercise" such power, the Act should be read not as undermining the courts' subject-matter jurisdiction, but as directing the exercise of their territorial or personal jurisdiction. *See State Dep't of Soc. Servs. v. Vijil*, 784 P.2d 1130, 1132 (Utah 1989) (distinguishing subject-matter jurisdiction, which "is the authority and competency of the court to decide the case," and personal jurisdiction, which "is the court's ability to *exercise its power* over a person for the purposes of adjudicating his or her rights and liabilities") (emphasis added).

¶ 64 The "exercise" formulation, after all, is consistent with the latter notion of jurisdiction in the law. Utah's statutes on territorial jurisdiction prescribe the circumstances under which jurisdiction "may be exercised." UTAH CODE ANN. § 78B–3–209 (2008). The federal rules use a similar formulation. *See* FED.R.CIV.P. 4(k)(2) (addressing circum-

stances in which the exercise of jurisdiction satisfies due process and "establishes personal jurisdiction over the defendant [who] is not subject to jurisdiction in any state's courts of general jurisdiction"). Subsection (g)'s use of this same terminology suggests that Congress had a similar concept of exercising jurisdiction in mind—one that goes not to the competency of the court to hear the class of dispute before it, but to the propriety of the exercise of that power in light of the parties' contacts with the forum state.

¶ 65 That conclusion is confirmed by the substantive standards that subsection (g)'s "jurisdictional" provision shares in common with standards of territorial jurisdiction. Subsection (g)'s jurisdictional directive applies only if a case has been first filed "in a court of another State where such court of that other State is exercising jurisdiction consistently with the provisions of this section," 28 U.S.C. § 1738A(g)—specifically, where the first forum state is the child's "home state" or where there is no home state and the child and his parents have a "significant connection with such State" and "there is available in such State substantial evidence concerning the child's present or future care, protection, training, and personal relationships," id. § 1738A(c)(2). These standards are rough parallels of the usual grounds for establishing territorial jurisdiction—that the forum state is the defendant's "domicile" or a place in which the defendant has established sufficient "minimum contacts." See Olseth v. Larson, 2007 UT 29, ¶ 18, 158 P.3d 532 (minimum contacts); Neville v. Neville, 740 P.2d 290, 292 (Utah Ct.App.1987) (domicile).

¶ 66 Subsection (g)'s directive concerning the "exercise" of jurisdiction is also comparable to some close cousins to territorial jurisdiction in the law, which all go to the propriety of the court's exercising jurisdiction given the parties' forum connections or circumstances involving parallel proceedings. Federal venue, for example, limits the exercise of federal jurisdiction to cases brought in a federal district in which all defendants "reside," in a district in which a substantial part of the events giving rise to the claim occurred, or a district where any defendant may be "found" (if there is no other district where venue is proper). 28 U.S.C. § 1391(b). The supplemental jurisdiction statute, by comparison, gives federal courts the discretion not to "exercise supplemental jurisdiction" over a state law claim that is pendent to a federal claim. Id. § 1367(c). Doctrines of abstention and exhaustion likewise identify circumstances in which "there is concurrent jurisdiction" in proceedings pending in two separate courts, but where comity or deference counsels one court to "decline jurisdiction in certain circumstances." Iowa Mut. Ins. Co. v. LaPlante, 480 U.S. 9, 17 n. 8, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987). (These circumstances, incidentally, again are substantively reminiscent of the standards prescribed for the exercise of jurisdiction in the PKPA, which likewise go to coordination of parallel proceedings, not the competence of a court to hear the case.)

¶ 67 Because the "exercise" of jurisdiction prohibited by subsection (g) shares so much in common (both linguistically and substantively) with territorial jurisdiction and its cousins, and so little in common with the notion of subject-matter jurisdiction, it makes sense in context to treat this provision as an analog to the former doctrines involving the exercise of jurisdiction. Those analogies, moreover, cut unanimously against Wyatt's conclusion that subsection (g) is not subject to waiver. Territorial jurisdiction, for example, has nothing to do with the competency of a court; it instead "recognizes and protects an individual liberty interest," and is not a "restriction on judicial power ... as a matter of sovereignty" and thus "it can, like other such rights, be waived." Ins. Corp., 456 U.S. at 702–03, 102 S.Ct. 2099. The same goes for venue,[4] supplemental jurisdiction,[5] and abstention and exhaustion.[6]

---

**4.** See Fed. R. Civ. P. 12(h) (defense of venue waived if omitted from motion or responsive pleading).

**5.** See Int'l Coll. of Surgeons v. City of Chic., 153 F.3d 356, 366 (7th Cir.1998); Lucero v. Trosch, 121 F.3d 591, 598 (11th Cir.1997).

**6.** See Int'l Coll. of Surgeons, 153 F.3d at 360 n. 4 (holding that state "may waive an abstention argument," for example, under Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)); Iowa Mut. Ins. Co., 480 U.S. at 17 n. 8, 107 S.Ct. 971 (explaining that exhaustion re-

¶ 68 For these reasons, I would hold (in the words of the District of Columbia Court of Appeals) that subsection (g)'s notion of jurisdiction "does not go to the power of the court to adjudicate the case, and may be waived if not asserted in a timely fashion." *B.J.P. v. R.W.P.*, 637 A.2d 74, 78 (D.C.1994). As the court noted in *B.J.P.*, the contrary view "permit[s] a litigant to contest the merits of a controversy in a convenient forum, exult in victory if she wins, but keep the jurisdictional card in her hip pocket, to be produced only in the event that she loses." *Id.* at 79. This prospect is especially troubling given that jurisdictional questions under the PKPA are "highly context-sensitive, and often turn on difficult judgment calls," *id.*, such as whether the parents and child had a "significant connection" with the first forum state, 28 U.S.C. § 1738A(c)(2)(B)(ii)(I), and whether that state has "substantial evidence" concerning the child's present or future care, *id.* § 1738A(c)(2)(B)(II).

## II. APPLICABILITY OF THE PKPA TO ADOPTIONS

¶ 69 I would also reject Wyatt's reliance on the PKPA on the ground that the Act has no application to adoption proceedings. The majority reads the Act's application to proceedings for "custody or visitation" determinations broadly to encompass adoption proceedings. An alternative construction would read the statutory language more narrowly with reference to the most common context in which such words are used—the determination of custody and visitation rights pursuant to a divorce. In context, I believe that the latter interpretation is correct.

¶ 70 The majority emphasizes that the PKPA extends to " '*any* proceeding for a custody ... determination.' " *Supra* ¶ 16 (quoting 28 U.S.C. § 1738A(g) (emphasis added)). But that proposition begs the underlying question of what counts as a custody determination in the first place. I would address that question by analyzing the meaning of the text or "plain language" of the statute, resolving any ambiguities by asking how a reader of the text would be most likely

to understand it in light of the statute's linguistic and legal context. *See Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465.

¶ 71 In the context in which the term "custody determination" is used in the PKPA, I am persuaded that the narrower, term of art construction is the one more likely implicated by the language of the Act. I reach that conclusion in light of (a) the statutory definition of custody determination and its surrounding terminology; (b) the statute's expressly stated purpose; (c) the statutory and linguistic context of the terms of the Act; (d) the statute's legislative history; and (e) a longstanding "clear statement rule" requiring a narrow construction of statutes that implicate traditional state prerogatives.

### A. The Statutory Definition

¶ 72 When interpreting the meaning of an expressly defined term, we look first to the statutory definition. *Grynberg v. Questar Pipeline Co.*, 2003 UT 8, ¶ 30, 70 P.3d 1. The PKPA defines "custody determination" as a "judgment, decree, or other order of a court providing for the custody of a child, ... includ[ing] permanent and temporary orders, and initial orders and modifications." 28 U.S.C. § 1738A(b)(3). The Act elsewhere proscribes the exercise of jurisdiction, under certain circumstances, over "*any* proceeding for ... custody." *Id.* § 1738A(g) (emphasis added). Relying on this language, the majority has characterized the PKPA's definition of "custody determinations" as "broad." *See supra* ¶¶ 16, 19.

¶ 73 But this definition is not broad; it's circular. The Act essentially states that a *custody determination* is any proceeding that *determines custody*. The Act's use of the phrase "*any* custody determination," 28 U.S.C. § 1738A(a) (emphasis added), is likewise unhelpful. Whether the PKPA is characterized as applying to *any*, *every*, or *all* proceedings for custody, that conclusion merely sidesteps the question presented by this case: What is a custody determination

quirements like that in *Nat'l Farmers Union Ins. Cos. v. Crow Tribe*, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), do "not deprive the federal courts of subject-matter jurisdiction").

for the purposes of the PKPA, and does that phrase encompass an adoption proceeding? For the reasons discussed below, I would hold that it does not.[7]

¶ 74 More helpful than the PKPA's circular definition of "custody determination" is the enumerative or extensional portion of the definition—its listing of those orders that result from the custody determinations to which the PKPA applies, including "permanent and temporary orders, and initial orders and modifications." 28 U.S.C. § 1738A(b)(3). Rather than state the necessary and sufficient conditions for inclusion in the class of things that the PKPA characterizes as "custody determinations," Congress has chosen to list the kinds of orders that result from these determinations. In order to understand the PKPA's use of the phrase "custody determination," we should consider the orders listed and determine what unifying features make them a meaningful class. This is just another way of stating a familiar rule of statutory construction: "where two or more words are grouped together and ordinarily have a similar meaning, but are not equally comprehensive, the general words will be limited and qualified by the special words." 2 SUTHERLAND STATUTORY CONSTRUCTION 393 (3d ed. 1943); *see also Morton Int'l Inc. v. Auditing Div.*, 814 P.2d 581, 591–92 (Utah 1991) *superseded by statute on other grounds*, UTAH CODE ANN. § 59–1–610(1)(b).

¶ 75 The majority declares that "[h]ad Congress intended the PKPA to apply only to a narrow subset of all possible 'custody determinations,' it could have chosen either to list those proceedings included or, at least to enumerate those excluded. It did neither." *See supra* ¶ 19. That is true, but analytically unhelpful. Whenever a statute is susceptible of two plausible interpretations, it will always be the case that the legislature could have spoken more clearly if it had anticipated the precise question before the court. But that fact is hardly ever material, since one can almost always imagine clarifying amendments cutting both ways. Thus we may suggest that Congress could have said "custody proceedings in a divorce context" if it had intended a narrow construction. But we may also note that Congress could have said "custody or adoption proceedings" if it had intended a broad meaning of custody. It adds nothing analytically to hypothesize how Congress might have spoken with greater clarity. We instead must simply ask what Congress did say and interpret it as best we can.

¶ 76 In this case, in any event, Congress did enumerate those proceedings that come within the ambit of the PKPA. They are proceedings that result in "permanent and temporary orders, and initial orders and modifications,"—the type of modifiable custody orders most often associated with a divorce.

¶ 77 The orders listed in the definition of "custody determination"—permanent and temporary custody orders, initial orders, and modifications—are all inherently and perpetually modifiable.[8] This modifiability of custo-

---

7. Unlike the majority, *see supra* ¶ 23, I see no basis for assuming that Congress has given any attention to state court constructions of the PKPA in its prior amendments of the Act, much less that its silence is an indication of any agreement with those interpretations. Given the inertia inherent in the political process, congressional silence seems more likely to be the result of indifference, unawareness, or disagreement about whether or how to alter the status quo. *Johnson v. Transp. Agency*, 480 U.S. 616, 672, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987) (Scalia, J., dissenting); *Girouard v. United States*, 328 U.S. 61, 69–70, 66 S.Ct. 826, 90 L.Ed. 1084 (1946). Thus, it is more than a little stretch for this court to assume that Congress "ordinarily" corrects judicial interpretations that it disagrees with. *See supra* ¶ 23. That seems quite unlikely here to me. It seems much more likely that Congress was simply indifferent (if it was aware), since (a)

members of Congress who learn that *state courts* have ceded some of their *own jurisdiction* under an expansive reading of *federal* law seem unlikely to perceive a federal stake in correcting the error; and (b) when the PKPA was amended, there was disagreement in the state courts on the question of the Act's application to adoptions, so silence is "as consistent with a desire to leave the problem fluid" as it is with "an adoption by silence" of cases on one side of the debate. *See Girouard*, 328 U.S. at 70, 66 S.Ct. 826.

8. *See Tucker v. Tucker*, 910 P.2d 1209, 1215–16 (Utah 1996) ("A temporary custody order is only that, temporary. It is effective only until a fully informed custody determination can be made at a final hearing ... Permanent custody is modifiable only upon a threshold showing of a substantial and material change of circumstances."); *see*

dy determinations was the impetus for creating the PKPA in the first place. *See infra* ¶¶ 79–85. The enumeration of exclusively modifiable orders suggests that the Act is targeted toward the type of order that results from a custody determination pursuant to a divorce, not an adoption.[9]

¶ 78 Adoptions are never modifiable. In Utah, once a final decree has been entered no one who was a party to the proceeding, served with notice, or who executed consent to the adoption is allowed to contest the adoption. UTAH CODE ANN. § 78B–6–133(7)(a)(i)–(iii). Once the one-year statute of limitations has run, an adoption may not be contested at all, even if the challenger is claiming "fraud, duress, undue influence, lack of capacity, mistake of law or fact, or lack of jurisdiction." *Id.* § 78B–6–133(7)(c)(i). Thus, "[w]hen we speak of modifying custody orders, we are ordinarily talking about the typical case of a contest between natural parents." *In re Clausen*, 442 Mich. 648, 502 N.W.2d 649, 668 n. 22 (1993).[10] The PKPA prevents unnecessary modification by outlining specific circumstances in which modification is appropriate. 28 U.S.C. § 1738A(f). Because adoption decrees are not subject to modification, the custody determinations covered by the PKPA should not be read to apply to adoptions.

### B. The PKPA's Express Purpose

¶ 79 The statute's stated purpose likewise confirms that the PKPA is addressed to mod-

ifiable custody determinations such as those made pursuant to a divorce. As the majority recognizes, that purpose is expressly set forth in the PKPA: "Full faith and credit [shall be] given to child custody determinations." 28 U.S.C. § 1738A. Notably, the PKPA is appended to the full faith and credit statute, which states that the "[a]cts, records and judicial proceedings ... shall have the same *full faith and credit* in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken." *Id.* § 1738 (emphasis added). As indicated, the PKPA has the "*same operative effect* as the full faith and credit statute." *Thompson v. Thompson*, 484 U.S. 174, 183, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988) (emphasis added).

¶ 80 The stated purpose of the PKPA and its position in the statutory scheme suggest that in passing the Act, Congress confronted a particular problem with a particular remedy. In the PKPA, Congress extended full faith and credit to custody determinations so that a divorced parent would no longer have incentive to "snatch" a child and commence custody-modification proceedings in another state.

¶ 81 Courts in Utah and elsewhere have long recognized that adoption decrees are final judgments entitled to full faith and credit. *See Hood v. McGehee*, 237 U.S. 611, 615, 35 S.Ct. 718, 59 L.Ed. 1144 (1915); RESTATEMENT (FIRST) OF CONFLICTS OF LAWS § 143 (1934). That settled principle is no

---

*also* HOMER H. CLARK, JR., THE LAW OF DOMESTIC RELATIONS IN THE UNITED STATES § 19.9, at 836 (2d ed. 1988) ("Custody orders ... are modifiable pursuant to statute in most states, or, in the absence of statute, pursuant to the common law."); *see also* UTAH CODE ANN. § 30–3–10.4(2)(b)(I) (Supp.2010) (requiring a "material and substantial change of circumstance" before a modification of a joint or physical custody order).

**9.** Greg Waller, *When the Rules Don't Fit the Game: Application of the Uniform Child Custody Jurisdiction Act and the Parental Kidnapping Prevention Act to Interstate Adoption Proceedings*, 33 HARV. J. ON LEGIS. 271, 295–96 (1996) ("Unlike other proceedings found to be 'custody determinations' ... decrees of adoption and of termination of parental rights are not perpetually modifiable; neither can be reversed because of changed circumstances.... It is this same char-

acteristic of finality which renders one of the primary concerns of [the PKPA]—the need for statutory limits on the modifiability of child custody decrees–completely moot when [applied to adoptions].").

**10.** *See also id.* ("Where circumstances change, modification can be made in the child's best interests, because the biological parents have an inherent right to care, custody, and control of the child. *That rationale, however, does not apply in a case such as this involving an adoption petition.* The decision not to terminate ... and to dismiss the adoption petition put an end to the proceeding, just as would have been the case had the ... courts ... finalized the adoption. To say that the order in the instant case is modifiable would have the effect of destabilizing finalized adoptions as well as other final orders." (emphasis added)).

less valid today. *See Bonwich v. Bonwich,* 699 P.2d 760, 762 (Utah 1985); *Finstuen v. Crutcher,* 496 F.3d 1139, 1156 (10th Cir. 2007). In contrast to the full faith and credit status accorded adoptions, a line of Supreme Court cases held that the modification of custody decrees of foreign states was not foreclosed by the Full Faith and Credit Clause. *See, e.g., Ford v. Ford,* 371 U.S. 187, 83 S.Ct. 273, 9 L.Ed.2d 240 (1962); *Kovacs v. Brewer,* 356 U.S. 604, 78 S.Ct. 963, 2 L.Ed.2d 1008 (1958); *Halvey v. Halvey,* 330 U.S. 610, 612–14, 67 S.Ct. 903, 91 L.Ed. 1133 (1947). Since a "custody decree was not irrevocable and unchangeable" but modifiable "at all times" in the court that issued it, custody determinations were deemed not entitled to full faith and credit, and modifiable in the courts of another state. *Halvey,* 330 U.S. at 612, 67 S.Ct. 903.[11] As a result, prior to the PKPA divorced parents would routinely abscond with their children, crossing state lines to obtain a favorable determination. So-called "child-snatching" was considered a national epidemic.[12]

¶ 82 Within this context, the PKPA was passed with the express purpose of granting full faith and credit to custody proceedings. The United States Supreme Court has recognized the grant of full faith and credit to "custody determinations" as the actuating purpose behind the passage of the PKPA:

At the time Congress passed the PKPA, custody orders held a peculiar status under the full faith and credit doctrine, which requires each State to give effect to the judicial proceedings of other States.... The anomaly traces to the fact that custody orders characteristically are subject to modification as required by the best interests of the child. As a consequence, some courts doubted whether custody orders

were sufficiently "final" to trigger full faith and credit requirements.... Congress' chief aim in enacting the PKPA was to extend the requirements of the Full Faith and Credit Clause to custody determinations.

*Thompson,* 484 U.S. at 180, 183, 108 S.Ct. 513 (internal citations omitted).

¶ 83 Thus, prior to the passage of the PKPA, adoptions and custody determinations differed in one important respect. Adoption proceedings were unequivocally classified as final judgments on the merits, subject to the Full Faith and Credit Clause and enforceable in foreign states. Custody determinations, in contrast, were not so classified, and their enforcement across state lines was uncertain. Into this simple, two-place paradigm, Congress thrust the PKPA, a statute that requires that "[f]ull faith and credit [be] given to child custody determinations." 28 U.S.C. § 1738A. Because the statute's stated purpose is not consistent with the application of the PKPA to adoption proceedings, I am persuaded that the custody determinations whose status Congress sought to change are those that result in the modifiable custody orders most often granted pursuant to a divorce.

¶ 84 Indeed, the PKPA's stated purpose of according full faith and credit to child custody determinations is superfluous as applied to adoptions.[13] We have consistently avoided interpretations that render a provision of the statute superfluous and preferred instead constructions that "give meaning to all [of a statute's] parts." *See LKL Assocs., Inc. v. Farley,* 2004 UT 51, ¶ 7, 94 P.3d 279. That principle should apply with greater force where the provision rendered superfluous is the statute's *expressly stated purpose.*

**11.** *See also Thompson,* 484 U.S. at 180, 108 S.Ct. 513 ("Even if custody orders were subject to full faith and credit requirements, the Full Faith and Credit Clause obliges States only to accord the same force to judgments as would be accorded by the courts of the State in which the judgment was entered. Because courts entering custody orders generally retain the power to modify them, courts in other States were no less entitled to change the terms of custody according to their own views of the child's best interest.").

**12.** *See generally* Leona Mary Hudak, *Seize, Run, and Sue: The Ignominy of Interstate Child Custody Litigation in American Courts,* 38 Mo. L.Rev. 521 (1974); Henry H. Forster & Doris Jonas Freed, *Child Snatching and Custodial Fights: The Case for the Uniform Child Custody Jurisdiction Act,* 28 Hastings L.J. 1011 (1977).

**13.** Herma Hill Kay, *Adoption in the Conflict of Laws: The UAA, Not the UCCJA, Is the Answer,* 84 Calif. L.Rev. 703, 713–14 (1996); Joan Heifetz Hollinger, Adoption Law & Practice § 4.07(6)(b) (2009).

¶ 85 Because the statute's statement of purpose is clear, there is no reason to look beyond the text of the statute in order to discover a more generalized purpose. What the majority characterizes as the "statute's stated goals and purposes," *supra* ¶ 22, are not, in fact, stated in the statute. Instead they are found in the "Congressional findings and declaration of purposes." Parental Kidnapping Act of 1980, Pub.L. 96–611, § 7, 94 Stat. 3569. It is true that these findings were circulated among the members of Congress prior to the vote on the PKPA, but whatever advantages these materials may enjoy over other materials properly classified as "legislative history," they all suffer from the same defect: they are not the law. They have not been codified and they are not enforceable. Even if we grant that members of Congress read and considered these purposes before voting, we ought to assume, if the language is "plain," that Congress has elected the method by which it intends to achieve these purposes, which is set forth in the express provisions of the PKPA. If Congress has spoken with a clear voice, as the majority insists it has, then there is no reason to look beyond the text to see what Congress meant.[14] That text, including the express statement of purpose, thoroughly undermines the majority's interpretation of the custody determinations covered by the PKPA.

### C. Statutory and Linguistic Context

¶ 86 We interpret statutes with reference to their linguistic and statutory context. *See*

*Kimball Condos. Owners Ass'n v. Cnty. Bd. of Equalization,* 943 P.2d 642, 648 (Utah 1997); *Day v. Meek,* 1999 UT 28, ¶ 16 n. 6, 976 P.2d 1202. "[A]bsent express direction to the contrary," we also read statutory terms of art consistently with their ordinary legal or common-law usage. *Kelson v. Salt Lake Cnty.,* 784 P.2d 1152, 1156 (Utah 1989); *see also State Farm Mut. Auto. Ins. Co. v. Clyde,* 920 P.2d 1183, 1186 (Utah 1996). Here the context and common usage of the PKPA's language cuts against Wyatt's construction of the Act.

### 1

¶ 87 Perhaps the most salient contextual cue as to the scope of the PKPA is the Act's repeated use of the term "custody," a term never defined in the statute. The PKPA speaks of the "right to custody," 28 U.S.C. § 1738A(b)(2), and of those "awarded custody," *id.* § 1738A(b)(6), all without explaining what is meant by "custody." Further, by defining "custody determinations" circularly as any proceeding "providing for the *custody* of a child," *Id.* § 1738A(b)(3) (emphasis added), Congress appears to assume that we know what "custody of a child" means.[15] It makes no sense to conclude, as the majority does, that the definition of "custody determinations" should be read together with the defined term "physical custody." *Supra* ¶ 16. The Act clearly distinguishes between "custody" at large and "physical custody,"[16] and gives us no reason to collapse the one into the other.[17] Instead, the omission of a definition for the term "custody" and its re-

---

14. Even if we do look beyond the text to consider the legislative history, that history also undermines the majority's construction of the Act. *See* Part I.D.

15. When faced with a circular definition in a statute, it is not uncommon for courts to look to the traditional meaning ascribed to a statutory term. *See, e.g., Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 323, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) (appealing to the common-law meaning of the term "employee" when faced with a circular statutory definition).

16. *See, e.g.,* 28 U.S.C. § 1738A(b)(6) (" '[P]erson acting as a parent' means a person, other than a parent, who has *physical custody* of a child and who has either been *awarded custody* by a court or claims a *right to custody.*") (emphases added).

17. In fact, defining "custody determinations" as proceedings "providing for the [physical] custody of a child," would exclude from the PKPA an entire class of cases in which legal custody, not physical custody, is at issue. For example, Parent A may be awarded physical custody while Parent B retains some legal custody—i.e., decision-making authority related to the care, education, and upbringing of the child. If the definition of "custody determinations" is read together with the definition of "physical custody," Parent A could flee to a new state and seek a modification of the legal custody rights of Parent B. Nothing in the text of the PKPA suggests that the Act would countenance such a modification.

peated use in the PKPA suggest that we ought to interpret the term with reference to its ordinary legal meaning. *See Kelson,* 784 P.2d at 1156.

¶ 88 Granted, there are dictionary definitions of the term "custody" that are broad enough to encompass the notion of adoption.[18] But these definitions sweep in uses of "custody" that cannot conceivably be encompassed by the PKPA, such as the "total public funds in the custody of the state treasurer," *see* UTAH CODE ANN. § 57-7-6 (2010); a trustee's "custody" of the *res* of a trust, *see In re Montello Salt Co.,* 88 Utah 283, 53 P.2d 727, 730 (1936); or the state's "custody" of unclaimed property, *see* UTAH CODE ANN. § 77-24a-4 (2008). Other dictionaries define the family-law term "custody" more narrowly, with reference to custody determinations made pursuant to a divorce.[19] Thus, though dictionary definitions may be helpful in de-

termining the range of possible meanings of the term "custody," they cannot identify which of those meanings is intended or more likely to be understood in a particular linguistic or statutory context.[20] A proper interpretation of meaning in the midst of a range of definitions requires a consideration of the use of the term in its relevant context.

¶ 89 In the context of contemporary usage, by far the most common family-law sense of the word "custody" occurs in the setting of a divorce.[21] The word "custody" is some ten times more likely to collocate [22] with the word "divorce" than with the word "adoption" in contemporary usage.[23] A similar result holds for the use of "custody" by this court and the Utah Court of Appeals. From the passage of the PKPA in 1980, the courts of this state used the term "custody" most often in its divorce context.[24] Even in those

18. *See, e.g.,* 4 OXFORD ENGLISH DICTIONARY 167 (2d ed. 1989) ("Safe keeping, protection, defence [sic]; charge, care, guardianship."); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 343 (1986) ("1a: the act or duty of guarding and preserving (as by a duly authorized person or agency): safekeeping b: protection, care, maintenance, and tuition: Guardianship.").

19. *See, e.g.,* WEBSTER'S NEW WORLD LAW DICTIONARY 115 (Susan Ellis Wild ed. 2006) ("The physical control over a minor awarded by a court to a parent in a divorce or separation proceeding."). The fifth edition of *Black's Law Dictionary,* published in 1979, the year the PKPA was debated in Congress, contained a similar definition of *Custody of children:* "The care, control and maintenance of a child which may be awarded by a court to one of the parents as in a divorce or separation proceeding." BLACK'S LAW DICTIONARY 347 (5th ed. 1979).

20. *See, e.g.,* HENRY M. HART, JR., & ALBERT M. SACKS, THE LEGAL PROCESS: BASIC PROBLEMS IN THE MAKING AND APPLICATION OF LAW 1375-76 (William N. Eskridge, Jr. & Phillip P. Frickey eds., 1994).

21. This conclusion is based on a review of 500 randomized sample sentences (and the articles or transcripts from which the sentences were drawn) in which the term "custody" was used in the Corpus of Contemporary American Usage (COCA). *See* Mark Davies, *The Corpus of Contemporary American English: 410+ million words, 1990-present, COCA:* http://corpus.byu.edu/coca/(2008-). Of those, 202 uses of the term were found in a criminal law context. One-hundred forty-six explicitly referenced divorce and another seventy-one referenced the actions of child protective services agencies or children

placed in foster care. Only twelve sentences out of 500 made any reference to adoption. The COCA is "the largest freely-available corpus of English, and the only large and balanced corpus of American English.... The corpus contains more than 410 million words of text and is equally divided among spoken, fiction, popular magazines, newspapers, and academic texts." *Id.* A similar approach to statutory meaning—based on common usage as indicated by an electronic database—was employed by the United States Supreme Court in *Muscarello v. United States,* 524 U.S. 125, 129, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998), and in *FCC v. AT & T,* — U.S. ——, 131 S.Ct. 1177, 179 L.Ed.2d 132 (2011). *See* Brief for the Project on Government Oversight et al. as Amici Curiae Supporting Petitioners, *FCC v. AT & T Inc.,* No. 09-1279 (U.S. Nov. 16, 2010); *see also* Clark D. Cunningham, Judith N. Levi, Georgia M. Green & Jeffrey P. Kaplan, *Plain Meaning and Hard Cases,* 103 YALE L.J. 1561, 1596-97 (1993).

22. SUSAN HUNSTON, CORPORA IN APPLIED LINGUISTICS 68 (2002) ("Collocation is the tendency of words to be biased in the way they co-occur.").

23. As of this writing, the COCA reveals 129 co-occurrences of "custody" with "divorce," and only thirteen co-occurrences of "custody" with "adoption." See COCA *supra* ¶ 89 n. 21. (using the word "custody" in the search field, selecting "LIST," then clicking on "COLLOCATES" and "SEARCH").

24. A search of the Lexis "Utah Cases" database reveals 266 cases since 1980 that use the term "custody" in the same paragraph as the term "divorce" to the exclusion of "adoption," and

cases in which the terms "custody" and "adoption" co-occur, they typically are used distinctly to refer to different legal proceedings.[25] Consequently, if the interpretation of the PKPA is "a contest between probabilities of meaning," *See* Felix Frankfurter, *Some Reflections on the Reading of Statutes,* 47 COLUM. L.REV. 527, 527–28 (1947), I would find that the custody proceedings covered by the Act are limited to proceedings resulting in the modifiable custody orders of a divorce. We need not assume that the legislature intends to use statutory terms consistent with their most common meaning. But evidence that a given meaning of a term is the most common in a given context undermines the contention that a contrary interpretation must be inferred from the statute's "plain language."

2

¶ 90 Both the majority and Justice Durrant in his separate concurrence object to my reliance on linguistic data from an electronic corpus in analyzing the comparative usage of different possible meanings of the term *custody* in the PKPA, contending that such analysis is "of little analytical or persuasive value." *Supra* ¶ 19 n. 2. I disagree.

¶ 91 The majority asserts that my analysis "assumes that the words 'adoption' and 'divorce' are used with equal frequency" and that "the fact that the word 'custody' is ten times more likely to occur with the word 'divorce' than with the word 'adoption' may prove only that there are ten times as many divorces [as adoptions]." *See supra* ¶ 19 n. 2. But the corpus data make no such assumption about the relative frequency of "divorce" and "adoption," and there is no reason for conjecture. The noun "divorce" occurs some five times in the corpus for every four times "adoption" occurs.[26] Thus, while the word "divorce" is slightly more common than "adoption," it is quite telling that the former is overwhelmingly more likely to co-occur with the word "custody" than the latter. And this does not take into account the obvious proposition that while nearly all adoptions involve the care and protection of a child, not all divorces do.

¶ 92 Even if it were true that this merely demonstrated that "there are ten times as many divorces than there are adoption pro-

104 cases that use the term "custody" in the same paragraph as "adoption" to the exclusion of "divorce."

**25.** *See, e.g., T.M. v. B.B. (In re T.B.),* 2010 UT 42, ¶ 9, 232 P.3d 1026 (putative parent contests an adoption by filing petition for custody); *J.S. v. P.K. (In re Adoption of I.K.),* 2009 UT 70, ¶¶ 3–4, 220 P.3d 464 (same). The references to "custody" in the Utah and Uniform Adoption Acts cited in the majority opinion, *supra* ¶ 18, do not undermine this analysis. It is true that the Utah Act provides that during the pendency of an adoption, "[e]xcept as otherwise provided by the court ... the petitioner is entitled to the *custody and control* of the adoptee and is responsible for the care, maintenance, and support of the adoptee." UTAH CODE ANN. § 78B–6–133 (emphasis added). And under the Uniform Adoption Act (UAA), where a court sets aside a consent to an adoption, the court "shall order the return of the minor to the custody of the individual and dismiss a proceeding for adoption." UAA § 3–204 (1994). But I do not see how such actions are properly viewed as " 'custody determinations' under the PKPA's broad definition of that phrase," as the majority indicates. *Supra* ¶ 18. First, "custody and control" is awarded to an adoptive parent during the pendency of the adoption *as a matter of law.* There is no "determination" as that term is used in the PKPA. Further,

I do not dispute that there is a broad sense in which the term "custody" can be used with reference to "care, maintenance, and support." UTAH CODE ANN. § 78B–6–134(1). Rather, the language and context of the PKPA suggest that the phrase "custody determination" is used in the Act with reference to modifiable custody orders, such as those that result from a divorce. Second, under the UAA the court order resulting in an award of custody comes only after the adoption has failed. Though Utah has never adopted the UAA, an analogous procedure in Utah law provides that, if a court determines that "there are not proper grounds to terminate the person's parental rights," the court is required to "(i) dismiss the adoption petition; (ii) conduct an evidentiary hearing to determine who should have custody of the child; and (iii) award custody of the child in accordance with the child's best interest." *Id.* § 78B–6–133(b)(i)–(iii). Because the order for custody comes only after the dismissal of the adoption petition and a new evidentiary hearing, this provision highlights the differences rather than the similarities between adoption proceedings and custody determinations.

**26.** Enter [divorce].[n*] or [adoption].[n*], select KWIC and click "Search." There are 10,821 occurrences of "divorce" and 8,417 occurrences of "adoption."

ceedings," the corpus data would still be relevant to the question of what the words "custody or visitation determination" ordinarily mean. It seems reasonable to entertain the possibility that Congress may have used these terms with reference to the most common context in which they are found—even if they are found there more often only because the context itself is more common.

¶ 93 The majority also challenges my reliance on corpus data with a hypothetical: "If the word 'car' is ten times more likely to co-occur with the word 'red' than the word 'purple,'" the majority says, "it would be ludicrous to conclude from this data that a purple car is not a 'car.' Yet this is exactly what the Justice Lee has done." *Supra* ¶ 19 n. 2. But this is not at all what the collocation data show. The addition of a descriptive adjective would add little uncertainty to the scope of a statute regulating the use of "cars." A car's purpleness does not detract from its carness any more than its redness does. Likewise, a descriptive adjective would do nothing to muddy the scope of "custody proceeding." A long, contentious custody proceeding is every bit as much a custody proceeding as a short, amicable one is. Here, the majority conflates two general classes, suggesting that "adoption proceedings" are "custody proceedings" in the same way that "cars" are "cars."

¶ 94 A better analogy might be made under the famous "No vehicles in the park" edict.[27] Here a general class is invoked ("vehicles") without reference to any specific instances (like "cars" or "tricycles"). In this context, the linguistic environment in which "vehicles" is most commonly found and the words with which it most commonly co-occurs (words like "motor," "fuel," "cars," and "trucks") would be relevant to the inquiry.

Collocation data from the corpus are helpful here because it is not certain whether "vehicles" encompasses just cars or also tricycles.

¶ 95 As noted above, I share the view that we should not blindly attribute to every statutory term its most frequent meaning. *Supra* ¶ 89. Such an approach would be arbitrary and would lead to statutory incoherence. This is not the approach I have articulated, and not the one I have followed in my consideration of corpus linguistic data.[28]

¶ 96 Still, I cannot imagine how we can have a meaningful conversation about the "ordinary" meaning of a statutory term without asking how a given term is most commonly used in a given context. This, after all, is what the term "ordinary" means when used in a linguistic setting.[29] I do not suggest that the question of the comparative frequency of different senses is necessarily a dispositive one (even when, as above, that comparison examines the use of two competing senses in the relevant context). But I think the question of comparative usage is at least relevant, particularly where the inquiry into the statute's meaning is probabilistic.

¶ 97 When faced with an undefined statutory term, judges have traditionally looked to dictionaries to determine ordinary meaning. Where the dictionary presents more than one possible meaning, as is often the case, judges seldom provide a rationale for selecting among the alternatives; nor do they explain why one dictionary definition is more "ordinary" than the other.[30] This suggests that such determinations are intuitive rather than principled. *See infra* § 99. But dictionaries and our own intuition may not tell us how words are ordinarily used, and our reliance on both to determine the ordinary meaning

27. H.L.A. Hart, *Positivism and the Separation of Law and Morals*, 71 Harv. L.Rev. 593, 606–15 (1958); *see also* H.L.A. Hart, The Concept of Law 125–27 (Penelope A. Bulloch & Joseph Raz eds., 2d ed. 1994).

28. The concordance data above revealed that the most frequent sense of the term "custody" is the police "custody" of criminal suspects. *Supra* ¶ n. 21. Obviously, reading this sense of "custody" into the PKPA would be nonsensical.

29. 10 Oxford English Dictionary 912 (2d. ed. 1989) ("2. d. Of language, usage, discourse, etc.: that most commonly found or attested.").

30. Samuel A. Thumma & Jeffrey L. Kirchmeier, *The Lexicon Has Become a Fortress: The United States Supreme Court's Use of Dictionaries*, 47 Buff. L.Rev. 227, 257–58 (1998) ("[A]s with the other steps in the Court's general process of using dictionaries, selecting a specific definition for a term can be problematic, at times appears to lack principled guidance and can determine the outcome of a case.").

of a statutory term in a particular context is problematic.

¶ 98 First, dictionaries do not tell us how words are ordinarily used.[31] The dictionaries most relied upon by courts in statutory interpretation make no claims about the ordinariness of the words they define or the senses they assign to those words.[32] Nor do they present their lexical information in a way that reveals "ordinary" usage. A number of dictionaries simply rank their definitions according to evidence of historical usage.[33] And at least one commonly used dictionary, Webster's Third New International Dictionary, expressly disavows any attempt to establish a hierarchy of ordinariness in the ranking of its senses,[34] admitting that some-

times an "arbitrary" listing of senses is used.[35]

¶ 99 Even in those few instances where general use dictionaries make claims about ordinary usage, we have little reason to credit these claims.[36] Human beings (including both lexicographers and judges) "tend to notice unusual occurrences more than typical occurrences, and therefore conclusions [about ordinary meaning] based on intuition can be unreliable." [37] The process by which dictionaries are compiled amplifies this basic human predisposition—calling into question the dictionary-makers' judgments about ordinary usage.[38] Dictionaries are assembled from vast collections of sample sentences known as citation files.[39] In assembling these files,

**31.** Hart & Sacks, *supra* ¶ 87 n. 20, at 1190 ("A dictionary, it is vital to observe, never says what meaning a word must bear in a particular context. *Nor does it ever purport to say this.* An unabridged dictionary is simply an historical record, not necessarily all-inclusive, of the meanings which words in fact have borne ...." (emphasis added)); *see also* Stephen C. Mouritsen, *The Dictionary Is Not a Fortress: Definitional Fallacies and the Corpus–Based Approach to Plain Meaning,* 2010 BYU L.Rev. 1915, 1925–45 (discussing problems in dictionary usage by courts).

**32.** According to a study by Samuel A. Thumma and Jeffrey L. Kirchmeier, the dictionaries most often cited by the United States Supreme Court are the Webster's New International Dictionary (both the second and third editions), the Oxford English Dictionary, and Black's and Bouvier's law dictionaries. *See* Thumma & Kirchmeier, *supra* ¶ 97 n. 30. No similar study exists for this court's dictionary usage. These dictionaries do not generally present information on whether a given sense of a word is its "ordinary meaning" in a given context. *See infra* ¶ 98 n. 33–35.

**33.** 1 Oxford English Dictionary xxix 919 (2d. 1989) ("[T]hat sense is placed first which was actually the earliest in the language: the others follow in order in which they have arisen."); Webster's Third New International Dictionary 17a (1971) ("The order of senses is historical: the one known to have been first used in English is entered first. This re-ordering does not imply that each sense has developed from the immediately preceding sense.").

**34.** *See* Webster's Third New International Dictionary 17a ("The system of separating by numbers and letters reflects something of the semantic relationship between various senses of a word. It is only a lexical convenience. It does not evaluate senses or establish an enduring hierarchy of importance among them. The best sense is the one that most aptly fits the context of an

actual genuine utterance."); *see also* Corbin on Contracts § 539 at 511 n. 59 ("The better and more complete the Dictionary the more numerous and varied are the usages that it records and the less dogmatic are its assertions as to their relative merits.").

**35.** *See id.* Webster's Third New International Dictionary 17a ("Sometimes an arbitrary arrangement or rearrangement is the only reasonable and expedient solution to the problems of ordering senses.").

**36.** *See* Mouritsen, *supra* ¶ 97 n. 32 (discussing problems with dictionary claims about ordinary meaning).

**37.** Douglas Biber, Susan Conrad & Randi Reppen, Corpus Linguistics: Investigating Language Structure and Use 26 (1998); *see also* Susan Hunston, Corpora in Applied Linguistics 20 (2002) ("Although a native speaker has experience of very much more language than is contained in even the largest corpus, much of that experience remains hidden from introspection."); J. Charles Alderson, *Judging the Frequency of English Words,* 28 Applied Linguistics 383 (2007) (noting that "judgments by professional linguists do not correlate highly with [objective measures of word frequency]").

**38.** Jonathon Green, Chasing the Sun: Dictionary Makers and the Dictionaries They Made xiv (1997) ("[D]ictionaries do not emerge from some lexicographical Sinai; they are the products of human beings. And human beings, try as they may, bring their prejudices and biases into the dictionaries they make.").

**39.** Sidney I. Landau, Dictionaries: The Art and Craft of Lexicography 190 (2d ed. 2001) ("A citation file is a selection of potential lexical units in the context of actual usage, drawn from a variety of

lexicographers routinely give disproportionate attention to uncommon uses, often to the detriment of common ones.[40] The focus is on presenting the full range of possible usage, not accurately representing common usage. What emerges is often a "highly skewed lexicon" [41]—skewed in favor of prestigious authors and unusual uses.[42]

¶ 100 Even recognizing the possibility that dictionaries may not reliably account for common usage, judges often rely on our intuitive judgments about which sense of a statutory term is more consistent with ordinary usage. But judges suffer from the same cognitive shortcomings that all native speakers of English do: our intuitions regarding ordinary meaning may not correlate with objective measures of language use. *See supra* ¶ 99 n. 37. Thus, while judges "typically rely on their own intuitions as native English speakers," a judge has "no way of determining whether she is correct in her assessment that her own interpretation is widely shared." [43]

¶ 101 Unlike the lexicographer, "our job is not to scavenge the world of English usage to discover whether there is any possible meaning of [a contested term]." *Chisom v. Roemer*, 501 U.S. 380, 410, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991) (Scalia, J., dissenting). Instead, "our job is to determine ... the ordinary meaning ... [or] to ask whether there is any solid indication in the text or structure of the statute that something other than ordinary meaning was intended." [44]

¶ 102 By trusting in dictionaries and our intuitions to reveal ordinary meaning, we are setting both to tasks they are ill-suited to perform. Dictionaries, while revealing a range of possible meanings of a word, can never tell us how a word is commonly or ordinarily used in a given context. I recognize that determining the ordinary meaning of statutory terms using data from an electronic corpus presents its own set of problems.[45] But the alternative is opacity—an intuitive judgment that is justified on the

---

written sources and often some spoken sources, chiefly because the context illuminates an aspect of meaning.").

**40.** *Id.* at 104 ("[C]itation readers all too often ignore common usages and give disproportionate attention to uncommon ones, as the seasoned birder thrills at a glimpse in the distance of a rare bird while the grass about him teems with ordinary domestic varieties that escape his notice. By contrast, a corpus that is sensibly developed will, by design, be representative, at least to a much greater degree than any citation file."); BIBER, CORPUS LINGUISTICS, *supra* ¶ 99 n. 37, at 26 ("[C]itation slips represent only those contexts that a human reader happens to notice (in some cases representing only the more unusual uses).").

**41.** RANDOLPH QUIRK, STYLE AND COMMUNICATION IN THE ENGLISH LANGUAGE 88 (1982) ("Given ... the tendency to take citations from the more prestigious authors, it is not difficult to see the danger of a highly skewed lexicon emerging from principles designed precisely in the interests of objective generality.").

**42.** GEOFF BARNBROOK, DEFINING LANGUAGE: A LOCAL GRAMMAR OF DEFINITION SENTENCES 46 (2002) ("Even the OED, despite its comprehensively descriptive aims, suffers from the lack of a properly representative corpus.... Detailed instructions were given to the [citation compilers] in the later stages, but these make it clear that the basis of selection would not produce a fully representative sample. [They were told], 'Make a quotation

for every word that strikes you as rare, obsolete, old-fashioned, new, peculiar, or used in a particular way.'").

**43.** Lawrence Solan, Terri Rosenblatt, & Daniel Osherson, *False Consensus Bias in Contract Interpretation*, 108 COLUM. L.REV. 1268, 1273–74 (2008) (discussing the related field of contract interpretation); *see also* Stephen C. Mouritsen, *Hard Cases and Hard Data: Assessing Cognitive and Corpus-Based Paths to Plain Meaning*, 13 COLUM. SCI. & TECH. L.REV. (forthcoming 2011) ("[I]n the realm of interpretation—of constitutions, statutes, and contracts—[a judge] ... has introspective access to the (ostensibly) ordinary language use of only a single language user—her own. Thus we might expect a high correlation (perhaps a perfect correlation) between what a judge deems to be ordinary language usage, and how the judge herself uses the language in question. With objectivity like that, who needs subjectivity?").

**44.** *Id.* (emphasis added).

**45.** *See* Lawrence M. Solan, *The New Textualists' New Text*, 38 LOY. L.A. L.REV. 2027, 2059 (2005) ("When the legal system decides to rely on the ordinary meaning of a word, it must also determine which interpretive community's understanding it wishes to adopt. This choice is made tacitly in legal analysis, but becomes overt when the analysis involves linguistic corpora because the software displays the issue on a screen in front of the researcher.").

basis of sources that do not stand for the proposition for which they are cited.[46] In this respect "citing to dictionaries creates a sort of optical illusion, conveying the existence of certainty—or 'plainness'—when appearance may be all there is."[47]

¶ 103 I have no problem citing dictionaries for the information that they *do* contain. Dictionaries may help the court by defining unknown terms or presenting a range of *possible* meanings that a term may bear in a given context.[48] But dictionaries do not tell us how words are commonly or ordinarily used, particularly in the context-specific circumstances of a particular statute. In such circumstances I think some other objective measure of language usage may be helpful.

¶ 104 Having said all of that, I should reiterate that I think the role for objective measures of language use is a limited one. It is a relevant inquiry, but certainly not dispositive. The meaning of a statutory term is ultimately a jurisprudential question, and the linguistic and legal context of a contested term will most often be the deciding factor in determining its meaning.

¶ 105 Still, this court historically has interpreted the language of statutes in accordance with their ordinary meaning as used in "common, daily, nontechnical speech," and according to the "meaning which they have for laymen in ... daily usage." *See O'Dea*, 2009 UT 46, ¶ 32, 217 P.3d 704 (internal citations omitted) I see no reason to withdraw from this framework when for the first time we

have a method of measuring how words are actually used in these contexts.

### 3

¶ 106 Further evidence of the divorce context of the PKPA is found in the Act's application to proceedings for "custody or *visitation*" determinations. 28 U.S.C. § 1738A(g) (emphasis added). As with "custody," the Act uses but never defines the term "visitation." *Id.* § 1738A(b)(2). The Act does, however, define "visitation determinations," again using circular terms: a "visitation determination" is any proceeding "providing for the visitation of a child," *id.* § 1738A(b)(5), indicating that the term is used in the Act to convey its ordinary, family-law meaning.

¶ 107 The notion of "visitation" is inconsistent with the context of adoption. In the interest of a stable home environment for an adopted child, the rights of the natural parent are completely severed prior to the entry of an adoption decree. Generally, no other person is entitled to visitation. In the instance of a failed adoption, the potential adoptive parents are treated as legal strangers to the child without any right to visitation.[49] For this reason, definitions of "visitation" most often refer to a divorce setting,[50] and the term virtually never collocates with "adoption" in contemporary usage.[51] The same is true in the usage of Utah courts, where the term "visitation" is most commonly found in the context of a "divorce."[52] It is

46. This court has often cited dictionaries as establishing *"the* ordinary meaning" of statutory terms. *See e.g., Davis v. Provo City Corp.*, 2008 UT 59, ¶ 15, 193 P.3d 86 (emphasis added).

47. A. Raymond Randolph, *Dictionaries, Plain Meaning, and Context in Statutory Interpretation*, 17 Harv. J.L. & Pub. Pol'y 71, 72 (1994); Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 Harv. J.L. & Pub Pol'y 61, 67 (1994) ("[A] dictionary ... is a museum of words, an historical catalog rather than a means to decode the work of legislature.").

48. *supra* ¶ 87 n. 20, at 1375–76.

49. *See, e.g., In re Connor*, 2007 UT 33, ¶ 23, 158 P.3d 1097 (holding that "failed-adoptive parents" become "legal strangers" to a child).

50. *See, e.g.,* Webster's New World Law Dictionary 270 (Susan Ellis Wild ed. 2006) ("The right of

the *non-custodial parent, granted by the divorce or family court,* to visit with the child on some sort of scheduled or regular basis." (emphasis added)); Black's Law Dictionary 1707 (9th ed. 2009) ("A relative's, esp. a noncustodial parent's period of access to a child.").

51. The term "adoption" was not listed among the top 500 collocates of "visitation." *See supra* ¶ 89 n. 23.

52. A search of the Lexis "Utah Cases" database reveals 189 cases in which the term "visitation" is used in the same paragraph as "divorce" to the exclusion of "adoption," and only 43 cases which use the term "visitation" in the same paragraph as "adoption" to the exclusion of "divorce." In many of these latter cases, moreover, adoption decrees are deemed to *cut off* any claims to visitation. *See, e.g., Barnes*, 2007 UT 33, ¶ 23, 158 P.3d 1097; *Hardinger v. Scott (State ex rel. B.B.)*, 2004 UT 39, ¶ 16, 94 P.3d 252.

therefore telling that the term "custody" is paired together with "visitation" on eight separate occasions in the PKPA. See 28 U.S.C. §§ 1738A(a), 1738A(b)(2), 1738A(b)(5), 1738A(c), 1738A(c)(2)(D)(ii), 1738A(d), and 1738A(g). The divorce connotation of "visitation" is yet another indication that its word pair ("custody") has a similar meaning, since statutorily paired terms commonly are understood to convey a common meaning. See SUTHERLAND *supra* ¶ 74.

¶ 108 The PKPA expressly applies to "modifications," and the statutory definition of that term likewise undermines Wyatt's extension of the statute to adoption proceedings. The term is defined in the Act as any "determination which modifies ... a prior custody or visitation determination concerning the same child." 28 U.S.C. § 1738A(b)(5). In addition to this circular definition, the PKPA identifies specific instances in which the exercise of jurisdiction to modify a custody or visitation order is appropriate. *Id.* § 1738A(f), (h). The notion of modification of a "prior custody" order is incompatible with the nature of an adoption proceeding, since subsequent proceedings never modify adoption decrees once they are final. The inclusion of these specific provisions for modification thus further confirms that the PKPA was not aimed at adoptions.

¶ 109 Finally, it is significant that in the cases in which this court has used the term "custody determination," that term is not applied to adoption proceedings. "Words of art bring their art with them,"[53] and courts have commonly assumed that "where Congress borrows terms of art ..., it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed." *Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952); *see also Kelson v. Salt Lake Cnty.,* 784 P.2d 1152, 1156 (Utah 1989) ("'[A]bsent express direction to the contrary, we presume that a term of art used in a statute is to be given its usual legal definition."). The semantic context of the PKPA and the numerous terms of art the Act borrows from family law (with either a circular definition or none at all) suggest that the Act was designed to address a particular problem: the inherent modifiability of custody and visitation determinations such as those entered pursuant to a divorce decree.[54]

4

¶ 110 The PKPA's provisions outlining the appropriateness of an initial exercise of jurisdiction over a custody matter are further contextual evidence that the Act does not apply to adoptions. Under the PKPA, the initial exercise of jurisdiction requires that the child establish either a home state or a significant connection with a particular forum. 28 U.S.C. § 1738A(c)(2). It is doubtful that a days-old infant who is (1) born in one state but immediately removed to another and (2) whose biological parents are domiciliaries of one state but whose adoptive parents are domiciliaries of another could meaningfully satisfy either of these criteria. The difficulty of evaluating these jurisdictional criteria in cases involving adoptions is another indication that the PKPA was aimed not at adoptions but at custody proceedings pursuant to a divorce.

---

**53.** Frankfurter, *supra* ¶ 24, at 537.

**54.** The majority further argues that an adoption is a custody determination because it "works the ultimate custody determination." *See supra* ¶ 17. That is, an adoption is a custody determination because it results in a custody determination. But this argument proves too much. There are a number of "proceedings" that ultimately could result in a custody determination but that surely are not covered by the PKPA. For example, the Utah Code states that a finding that a "parent is unfit or incompetent" is grounds for termination of parental rights. UTAH CODE ANN. § 78A–6–507. The Code characterizes as "prima facie evidence of unfitness," the fact that "the parent is incarcerated as a result of conviction of a felony." *Id.* § 78-6-507(2)(e). Thus, any felony proceeding may feasibly result in an "ultimate custody determination." Surely the courts of this state can proceed to prosecute felony defendants without worrying about the preemptive effect of some extra-territorial custody proceeding. If not, the PKPA presents more of an intrusion on state sovereignty than anyone has ever acknowledged, which is another reason to avoid the majority's expansive construction of the PKPA. *See infra,* ¶¶ 115–116.

¶ 111 The home state and substantial connection requirements are further evidence of how well-tailored the PKPA is for dealing with issues of parental child-snatching and how ill-suited the Act is to contested adoptions. In the typical child-snatching case, parents would take children from their established homes, flee to a new forum, seek to establish minimal contacts with that forum, and ask a judge to modify the order. Under such circumstances, the home state and significant connection/substantial evidence standards are powerful control mechanisms. But in the context of an infant adoption, children have not yet established a home state, and any of the paltry connections established in their birth state can generally be countered by an equal and opposite connection in the forum state.

### D. Legislative History

¶ 112 Legislative history is often an unreliable source of statutory meaning, particularly where it is employed to credit personal preferences of individual legislators over the duly enacted statutory text. *Rothstein v. Snowbird Corp.*, 2007 UT 96, ¶ 10, 175 P.3d 560. Where that text leaves room for more than one interpretation, however, the legislative history may be consulted to the extent it informs the prevailing understanding of the ambiguous words of the statute at the time of its enactment. *See In re Sinclair*, 870 F.2d 1340, 1342–45 (7th Cir.1989).

¶ 113 In my view, the language and structure of the PKPA remove any ambiguity regarding the meaning of the custody proceedings covered by the Act. Resort to legislative history is accordingly unnecessary.

¶ 114 Even assuming the need to move from the ostensibly plain language of the statute to its legislative history, however, that evidence merely confirms that Congress's focus was modifiable custody decrees in a divorce setting, not adoptions. The PKPA's legislative history is extensive. Yet in the hundreds of pages of committee hearings, floor debates, expert testimony, and supporting documentation there is not a single instance in which the word "adoption" occurs in reference to the PKPA. There are, of course, repeated references to the particular evil that the Act was intended to remedy: the kidnapping of children by a *parent*.[55] Thus, if the legislative history is to be our

---

**55.** *Proceedings and Debates of the 96th Congress*, 125 Cong. Rec. S. 374–95, at 394 (1979) (statement of Sen. Kennedy) ("[The PKPA is a] well-conceived bill to deal with the growing problem of interstate restraint of children *by their parents* during disputes over custody and visitation.") (emphasis added); *id.* (statement of Sen. McGovern) ("Regarding child kidnapping, the devastating effects of our current policies are clear. We have just not developed sufficient legal sanctions to *prevent a parent* from seizing, restraining, or concealing a child *from a parent* who has legal custody.") (emphases added); *Implementation of the Parental Kidnapping Prevention Act of 1980, Hearing Before the Subcomm. on Crime of the Comm. on the Judiciary*, 97th Cong. 13 (Sep. 24, 1981) (statement of Rep. Sensenbrenner) ("[W]ithout Federal involvement, it was practically impossible to get law enforcement authorities in another State to enforce a custody award that had been *made in the course of a divorce proceeding* in the State of residence of the *custodial parent*, as well as the other parent, when the divorce took place.") (emphases added); *id.* at 1 (statement of Rep. Hughes) ("[B]ecause these kidnappings arise from *contested divorces*, they are ignored as merely domestic relations cases." (emphasis added)); *id.* at 2 (statement of Rep. Hughes) ("[A]s the *rate of divorce rises* ... the frequency of parental kidnapping cases may be increasing by additional thousands of cases per

year." (emphasis added)); *Parental Kidnapping Prevention Act of 1979, S. 105, Subcomm. on Criminal Justice of the Comm. on the Judiciary and the Subcomm. on Child and Human Development of the Comm. on Labor and Human Resources*, at 1 (Jan. 30, 1980) [hereafter PKPA Hearing] (statement of Sen. Mathias) ("Today the Senate Subcommittees on Criminal Justice and Child and Human Development will examine a problem of increasing concern, *the abduction of a child from one parent by another parent*; and a proposed solution ... the Parental Kidnapping Prevention Act of 1979.") (emphasis added); *id.* at 5 (statement of Sen. Wallop) ("I applaud your every effort in helping to design an appropriate Federal response to an increasingly frequent, always heart-rending occurrence—the removal and restraints or concealment of a child *from one parent by the other parent*.") (emphasis added); *PKPA Hearing Addendum*, at 193 (Jan. 30, 1980) (statement of Sen. Hayakawa) ("[The PKPA] would stabilize and strengthen the law to discourage child-snatching, and encourage a stable environment for children who are already traumatized by *the divorce of their parents*.") (emphasis added); *id.* at 207 (statement of Rep. Ertel) ("If a state grants custody to *one parent*, there is little to stop *the other parent* from abducting the child and gaining custody in a different state.") (emphases added).

guide to statutory meaning, it calls into question the construction of the statute asserted by the majority. Surely an intent to regulate interstate adoptions and restrict the traditional sovereignty of the states over such matters would have been somewhere discussed or debated if that had been Congress's aim.

### E. Clear Statement Rule

¶ 115 Even if there were a plausible basis for reading the PKPA as attempting to strip the state courts of the power to hear adoption petitions, I still would reject that construction on the ground that the contrary view is also (at least) plausible and a settled canon of construction counsels against a broad construction of the Act.

¶ 116 In the face of ambiguity in a federal statute that implicates traditional state prerogatives, both federal and Utah cases tell us to read the statute narrowly absent a "clear" and "manifest" intent by Congress.[56] There is no doubt that the regulation of adoptions and other family affairs is a traditional state prerogative.[57] And in my view Congress's intent to divest state courts of their traditional jurisdiction over adoptions is far from "clear" or "manifest." Even if reasonable minds may differ on the best reading of the PKPA's "custody" clause, I do not see how there can be a reasonable debate about whether Congress's intent to strip state courts of their adoption authority was in any way "clear" or "manifest." Absent such a clear statement, it is our responsibility to jealously safeguard the jurisdiction of the courts of this state and to enforce the policy judgments of our legislature.

### III. CONCLUSION

¶ 117 Like its counterparts in other states, the Utah legislature has enacted a comprehensive adoption act, establishing strict deadlines and procedural requirements aimed at balancing the rights of biological parents, children, and adoptive parents. In this case, a biological father seeks to employ a federal statute (the PKPA) to circumvent the requirements of state law and to nullify our state courts' traditional jurisdiction over adoption proceedings. Courts in some other states have previously endorsed similar extensions of the PKPA. *Supra* ¶ 53 n. 2. Our court rightly declines to do so here. In my view, it should do so not only on the ground that Wyatt failed to preserve any argument under the PKPA, but also because that statute applies only to modifiable custody proceedings (as in a divorce context) and not to adoptions.

**56.** *Will v. Michi. Dept. of State Police*, 491 U.S. 58, 65, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *see also BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) ("[W]hen the Federal Government takes over ... local radiations in the vast network of our national economic enterprise and thereby radically readjusts the balance of state and national authority, those charged with the duty of legislating [must be] reasonably explicit.'" (quoting Frankfurter, *supra* ¶ 24, at 539–40) (alterations in original)); *Utah Div. of Consumer Prot. v. Flagship Capital*, 2005 UT 76, ¶ 19, 125 P.3d 894 (requiring that congressional mandate be "clear and manifest" when Congress purports to regulate areas "'traditionally occupied' by the States") (*citing English v. Gen. Elec. Co.*, 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990)) (further

internal quotations marks omitted); *In re of the Adoption of A.B.*, 2010 UT 55, ¶ 29, 245 P.3d 711 (requiring that Congress speak with "clear congressional voice" before we find that federal statute preempts state law) (internal quotation marks omitted).

**57.** *See Ex parte Burrus*, 136 U.S. 586, 593–94, 10 S.Ct. 850, 34 L.Ed. 500 (1890) ("The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States"); *Solomon v. Solomon*, 516 F.2d 1018, 1025 (3d Cir.1975) ("[S]tate courts have historically decided these [family law] matters and have developed both a well-known expertise in these cases and a strong interest in disposing of them.").