2021 UT 68

IN THE
## SUPREME COURT OF THE STATE OF UTAH

SOUTH UTAH VALLEY ELECTRIC SERVICE DISTRICT
*Appellant,*

*v.*

PAYSON CITY, SPANISH FORK CITY, AND SALEM CITY
*Appellees.*

No. 20190774
Heard September 16, 2021
Filed December 9, 2021

On Interlocutory Appeal

Fourth District, Utah County
The Honorable Kraig Powell
No. 180400994

Attorneys:

Mark O. Morris, Elizabeth M. Brereton, Parker A. Allred, Salt Lake City, for appellant

Phillip J. Russell, Gary A. Dodge, Mitchell Stephens, Justin L. James, Salt Lake City, for appellees

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which JUSTICE HIMONAS, JUSTICE PEARCE, JUSTICE PETERSEN, and JUDGE CHRISTIANSEN FORSTER joined.

Having recused himself, ASSOCIATE CHIEF JUSTICE LEE does not participate herein;
COURT OF APPEALS JUDGE MICHELE CHRISTIANSEN FORSTER sat.

CHIEF JUSTICE DURRANT, opinion of the Court:

**Introduction**

¶1 South Utah Valley Electric Service District (District) was established in 1985, at the request of the Utah County Commission,

S. Utah Valley Elec. Serv. Dist. *v.* Payson City

Opinion of the Court

to provide affordable electricity to rural areas in southern Utah County. As the population of southern Utah County has grown, neighboring municipalities have expanded, annexing areas within the District. Three cities, Payson City, Spanish Fork City, and Salem City (collectively, Cities), provide electricity to their residents and want to provide electricity to customers in areas they have annexed within the District. The District fears that losing customers to the Cities will make it impossible to maintain its financial obligations and continue to provide affordable electric service to its remaining customers.

¶2    This fight dates back twenty-five years, when this court considered a nearly identical conflict between the District[1] and Spanish Fork in 1996. In *Strawberry Electric Service District v. Spanish Fork City*, we held that Spanish Fork could provide electricity to customers within annexed portions of the District but only once they had complied with Utah Code section 10-2-424 (1996)—requiring Spanish Fork to "pay [the District] 'the fair market value of those facilities dedicated to provid[ing] service to the annexed area[s].'"[2] Since the *Strawberry* decision, the Cities and the District entered multiple agreements in an attempt to resolve their differences, but those efforts ultimately failed, and the parties filed suit against each other in 2018.

¶3    Central to the dispute between the Cities and the District is a disagreement over which statutory provisions govern the requirements the Cities must satisfy in order to take over service to electric customers in annexed portions of the District. The Cities argue that Utah Code section 10-2-421, an amended and renumbered version of former section 10-2-424, is the only applicable statutory requirement, requiring that the Cities either receive consent from the District or pay reimbursement costs prior to serving any of the District's customers. From the Cities' perspective, there have been no significant changes to the law since the *Strawberry* decision, and that holding determines the outcome of this dispute.

---

[1] The District was originally known as the Strawberry Electric Service District.

[2] 918 P.2d 870, 880 (Utah 1996) (second and third alterations in original) (quoting Utah Code § 10-2-424 (1996)).

¶4    The District counters that section 10-2-421 applies only to its electric customers outside of its boundaries,[3] and the Cities are required to comply with the statutory process to withdraw an area from the District that is set forth in Utah Code sections 17B-1-501–513 before providing electricity to any customers within the District. The District argues that because the Legislature amended relevant statutes in the years following *Strawberry*, and the *Strawberry* Court did not address the arguments the District now brings based on those statutory revisions, *Strawberry* does not resolve the current dispute.

¶5    The district court ruled in favor of the Cities, holding that compliance with section 10-2-421 is the only precondition to the Cities' taking over service to electric customers in annexed areas of the District. Because the plain text of section 10-2-421 supports the district court's interpretation, we affirm.

## Background

¶6    The District was established in 1985, following the enactment of the Utah Electric Service District Act (Act), becoming Utah's first electric improvement district. Under the Act, an electric improvement district could be formed at the request of a county commission in areas that had not been served by an investor-owned utility, municipal agency, or electrical cooperative in the preceding five years.[4] Any electric improvement district formed under the Act would be "a public utility . . . subject to the jurisdiction of the Public Service Commission."[5] The year the Act went into effect, the Utah County Commission successfully petitioned for the creation of the District.

¶7    The District is a political subdivision. It does not operate for profit and relies on revenue from its electric customers and bond sales to support its infrastructure and prepare for anticipated

---

[3] Although its primary purpose is to serve electric customers within its boundaries, an electric improvement district may also sell "services to consumers residing outside [its] boundaries." UTAH CODE § 17B-2a-403(1)(d). The District currently serves electric customers outside of its boundaries in parts of Mapleton, Spanish Fork City, Santaquin, and Benjamin.

[4] Utah Electric Service District Act, 1985 UT S.B. No. 7.

[5] *Id.*

growth. The District is one of just two electric improvement districts in Utah today. Other electricity providers include electrical cooperatives, electrical companies, counties, and municipalities.

¶8　In the 1990s, a conflict arose between the District and its growing neighbor, Spanish Fork City, as Spanish Fork annexed areas within the District. Like the argument now before us, Spanish Fork and the District disagreed about what was required of Spanish Fork in order to provide electricity to customers in the parts of the District that Spanish Fork had annexed. The conflict reached this court in 1996. We held that Spanish Fork could "lawfully invade [the District's] service area" but only after paying reimbursement costs outlined in former Utah Code section 10-2-424 (1996),[6] which has been replaced with current Utah Code section 10-2-421.

¶9　Since *Strawberry*, the population inside the District has continued to grow, and the Cities have annexed more areas within its boundaries. Additionally, the District issued bonds in 2002 "for the purpose of acquiring, constructing, and completing improvements and extensions to its electric service system." The District and the Cities have entered into multiple agreements and negotiations, but ultimately, these agreements have failed, leading to the parties filing suit against each other in 2018. The Cities and the District differ on many points—including the extent to which each party breached past agreements, which agreements are currently in effect, which customers the Cities have taken from the District, and what reimbursements are due.

¶10 While the conflict between the District and the Cities was simmering, the Legislature amended several relevant sections of the Utah Code. In 2002, the Legislature passed the Uniform Withdrawal Procedures for Special Districts Act, "repealing existing procedures for withdrawals from special or local districts and creating a uniform procedure for withdrawal."[7] The withdrawal procedures, as enacted in Utah Code sections 17B-1-501–513, update conditions for the withdrawal of areas from an electric improvement district—and all

---

[6] *Strawberry Elec. Serv. Dist. v. Spanish Fork City*, 918 P.2d 870, 880 (Utah 1996).

[7] Uniform Withdrawal Procedures for Special Districts Act, 2002 Utah S.B. 18.

other types of local districts.[8] In 2013, after almost two years of negotiations between different electric service providers and their representatives, the Legislature amended section 10-2-421 (formerly section 10-2-424), the section of the code that the *Strawberry* Court relied on, with the goal of minimizing conflicts.[9]

¶11 At the heart of the parties' disagreement today are two different interpretations of Utah law. The Cities argue that *Strawberry* is still good law and that they can take over the provision of service to electric customers in the District after annexation so long as they pay the required reimbursement costs under Utah Code section 10-2-421. The District argues that changes in both law and circumstances prevent *Strawberry* from controlling the outcome of the current conflict. According to the District, the Title 17B withdrawal procedures, not section 10-2-421, set the necessary conditions for the Cities to provide electric service to customers in its boundaries.

¶12 The Cities moved for partial summary judgment on the issue, asking the district court to hold that the Cities could provide electric service to customers in annexed areas of the District so long as they complied with section 10-2-421. The court granted the Cities' motion.

¶13 The District sought an interlocutory appeal, which we granted. We have jurisdiction under Utah Code section 78A-3-102(3)(j).

**Standard of Review**

¶14 In this case, we review a district court's grant of summary judgment based on statutory interpretation. We review both a district court's grant of summary judgment[10] and its statutory interpretation "for correctness, affording no deference to the district court's legal conclusions."[11]

---

[8] UTAH CODE § 17B-1-510(3)(a)–(f).

[9] Public Utilities Amendments, 2002 Utah S.B. 18; Debate on Public Utilities Amendments, 2002 Utah S.B. 18, https://le.utah.gov/~2013/bills/static/SB0180.html.

[10] *dōTERRA Int'l, LLC v. Kruger*, 2021 UT 24, ¶ 17, 491 P.3d 939.

[11] *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 12, 267 P.3d 863 (citation omitted).

S. Utah Valley Elec. Serv. Dist. *v.* Payson City

Opinion of the Court

**Analysis**

¶15 The Cities and the District have presented two very different interpretations of the Utah Code.

¶16 The Cities argue that Utah Code section 10-2-421 is the beginning and end of what is required for them to start serving the District's customers following annexation. They rely on this court's decision in *Strawberry Electric Service District v. Spanish Fork City*[12] to support their interpretation and argue that the statutory changes cited by the District have no relevant impact on that decision.

¶17 The District contends that section 10-2-421 does not stand alone and must be considered in relation to several other statutes, which reveal the Cities can serve electric customers only in parts of the District they have annexed if the areas are first withdrawn from the District. Significantly, the statutory process of withdrawal, outlined in Utah Code sections 17B-1-501–513, requires petitions for withdrawal to be denied if withdrawal would "adversely affect the ability of the local district to make any payments or perform any other material obligations under . . . any of its notes, bonds, or other debt or revenue obligations."[13] The District argues that *Strawberry* is not controlling because of changes made by the Legislature following the decision and because it is now bringing arguments that court never addressed.

¶18 We agree with the District that, because of the statutory changes subsequent to our issuance of *Strawberry*, and because of the new arguments the District advances in this case, *Strawberry* does not control the resolution of this case. But looking at the plain text of today's statutes, the District's proposed interpretation is nowhere to be found. The District looks to theories of legislative intent and policy goals to support its position, but its interpretation is not supported by the actual text of the statutes in question. Because the district court logically followed the text of the statutes at issue, we affirm the district court's grant of the Cities' motion for partial summary judgment.

I. The Plain Language of Utah Code Sections 10-2-421 and 10-8-21 Makes Clear That the Cities May Provide Electric Service to

---

[12] 918 P.2d 870 (Utah 1996).

[13] Utah Code § 17B-1-510(3)(b).

Customers Inside the District So Long as They Pay the Required
Reimbursements

¶19 The Cities argue that Utah Code sections 10-2-421 and 10-8-21 provide that they may take over electric service to customers in annexed areas so long as they first pay necessary reimbursements to the District. The District disagrees, arguing that section 10-2-421 applies narrowly to the customers the District serves outside of its boundaries, or alternatively, that section 10-2-421 is limited to the exact time of annexation. We determine that section 10-2-421 sets the conditions the Cities must meet in order to provide electric services to former District customers following annexation and that the section is not limited to the moment annexation takes place or the customers the District serves outside of its boundaries.

¶20 "We have repeatedly affirmed our commitment to interpreting statutes according to the 'plain' meaning of their text."[14] This is "[t]he best evidence of the legislature's intent."[15] So "[w]here a statute's language is unambiguous and provides a workable result, we need not resort to other interpretive tools, and our analysis ends."[16] Further, we do not "add[] terms or conditions not stated on the face of the statutory code."[17]

¶21 Utah Code section 10-2-421(2) is the only statute cited by either party that directly addresses the issue in this case—the provision of electric service by an annexing municipality to customers that previously belonged to an electric improvement district. At the time this conflict arose, Utah Code section 10-2-421(2) stated

> If an electric customer in an area being annexed by a municipality receives electric service from an electrical corporation, the municipality may not, without the agreement of the electrical corporation, furnish municipal electric service to the electric customer in the annexed area until the municipality has reimbursed the electrical corporation for the value of each facility used

---

[14] *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465.

[15] *Garfield Cnty. v. United States*, 2017 UT 41, ¶ 15, 424 P.3d 46 (alteration in original) (citation omitted).

[16] *Id.* (alteration in original) (citation omitted).

[17] *State v. Jordan*, 2021 UT 37, ¶ 33.

to serve each electric customer within the annexed area, including the value of any facility owned by a wholesale electric cooperative affiliated with the electrical corporation, dedicated to provide service to the annexed area.

In the same section, "electrical corporation" was defined as "(i) an entity as defined in Section 54-2-1; and (ii) an improvement district system described in Subsection 17B-2a-403(1)(a)(iv)."[18] The District does not fall within the definition of electrical corporation in section 54-2-1,[19] but is covered by the second part of the definition, "an improvement district system described in Subsection 17B-2a-403(1)(a)(iv)."

¶22 The electrical corporation definition refers to Utah Code section 17B-2a-403(1)(a)(iv), which grants improvement districts the ability to provide for "the generation, distribution, and sale of electricity, subject to Section 17B-2a-406 . . . ." Section 17B-2a-403(1)(a)(iv) and section 17B-2a-406 are together the two sections that allow for the creation of electric improvement districts, such as the District.

¶23 The District argues that section 10-2-421's electrical corporation definition applies only to the narrow group of electric customers that the District is serving outside of its boundaries. We are not convinced. Section 17B-2a-403(1)(a)(iv) does not include the limiting principle that the District asks us to infer—it does not refer to the provision of electric service outside of an electric improvement district's boundaries. And it cross-references section 17B-2a-406, which the District acknowledges is the subsection defining electric improvement districts. The District notes that a different subsection, subsection 17B-2a-403(1)(d), allows an electric improvement district to provide electric service to customers outside of its boundaries. But section 10-2-421's electrical corporation definition does not refer to this subsection. It refers to subsection 17B-2a-403(1)(a)(iv), which makes no distinction between the District's system serving customers inside or outside of the District.

---

[18] UTAH CODE § 10-2-421(1)(d) (2019).

[19] *Id.* § 54-2-1(6)(b), (8)(a) (expressly excluding "improvement districts" from its definition of electric corporation).

¶24 The District also argues that it is not included in section 10-2-421's electrical corporation definition because the provision refers to an improvement district system rather than an improvement district. But this is a distinction without a difference. The District's system is the "improvement district system." And that system is how it provides electric service to all of its customers—whether inside or outside of its boundaries. Because there is no statutory support for the District's narrow definition of "improvement district system," either in section 10-2-421 or section 17B-2a-403(1)(a)(iv), we will interpret section 10-2-421(1)(d) as referring to the District's entire system. So section 10-2-421 applies when "electric customer[s] in an area being annexed by a municipality receive[] electric service from" the District's system—including customers inside the District.

¶25 Section 10-2-421 provides two paths for municipalities to begin serving electric customers in annexed portions of an improvement district: (1) consent of the district, or (2) by "reimburs[ing] the electrical corporation for the value of each facility used to serve each electric customer within the annexed area[.]" The statute is written in the negative, so rather than saying that the municipality *may* provide electric service with consent or by paying the required reimbursement, the statute states the municipality *may not* provide electric service unless there is consent or until a reimbursement is paid. Read on its own, this may suggest that even if one of these two conditions is met, the municipality may still not be able to provide electric service.

¶26 "But we do not interpret the 'plain meaning' of a statutory term in isolation. Our task, instead, is to determine the meaning of the text given the relevant context of the statute."[20] And reading section 10-2-421 within the context of the powers granted to municipalities generally resolves any ambiguity here. Utah Code section 10-8-21 grants municipalities the ability to provide electric service within their boundaries. According to that section, municipalities "may provide for the lighting of streets and the erection of necessary appliances and lamp posts; may regulate the sale and use of gas, natural gas and electric or other lights and electric power within the city, and regulate the inspection of meters therefor."

---

[20] *Metro. Water Dist. of Salt Lake & Sandy v. SHCH Alaska Tr.*, 2019 UT 62, ¶ 16, 452 P.3d 1158 (citation omitted).

S. Utah Valley Elec. Serv. Dist. *v.* Payson City

Opinion of the Court

¶27   Reading Utah Code sections 10-2-421 and 10-8-21 together clarifies why 10-2-421 states "may not unless" rather than "may." The Cities have already been granted the power to "regulate the sale and use of . . . electric power" under Utah Code section 10-8-21. As a result, section 10-2-421 does not need to grant the cities a power they already have. Instead, it provides limiting conditions for the unique circumstances that result from annexation.

¶28 When municipalities' general grant of power to sell and regulate electricity is considered together with the limitations on that power when a city annexes an area within an electric improvement district, it becomes clear that section 10-2-421 sets forth the requirements for the Cities to take over service to the District's customers. The Cities generally have the power to regulate and sell electricity within their respective boundaries. But when they annex new land, that power is limited by the requirement that they either obtain the consent of the previous electric provider, if it falls within section 10-2-421's definition of electrical corporation, or pay it reimbursement costs.

¶29 Recognizing that section 10-2-421 is a restriction on municipalities' power, rather than a grant of power, also clarifies that section 10-2-421's use of the present progressive verb "being annexed" limits which customers the Cities must include in their reimbursement calculations—not the time frame of section 10-2-421's applicability. Section 10-2-421(2) states, "If an electric customer in an area being annexed by a municipality receives electric service from an electrical corporation, the municipality may not, without the agreement of the electrical corporation, furnish municipal electric service to the electric customer in the annexed area until the municipality has reimbursed the electrical corporation . . . ." The statute identifies which customers trigger the restriction. The Cities need to pay reimbursements only for customers who were receiving electric service from the District at the time of annexation. Section 10-2-421's title, "Electric utility service in annexed area -- Reimbursement for value of facilities -- Liability -- Arbitration," also supports this interpretation. The title refers to "service in annexed area" rather than an "area being annexed." Section 10-2-421 applies after annexation but only requires the Cities to reimburse the District for electric customers that it was serving at the time of annexation.

¶30  According to the Cities, their dispute with the District ends here as these two provisions alone resolve the conflict. The District argues, however, that several other provisions in the Utah Code reveal additional conditions the Cities must satisfy. We will address

each statutory provision referenced by the District in turn and explain why none of them changes our interpretation of section 10-2-421.

## II. None of the Statutes the District Relies on Addresses the Ability of Municipalities to Provide Electric Service in Its Service Area After Annexation

¶31 The District correctly states that "a court must 'read the plain language of the statute as a whole, and interpret its provisions in harmony with other statutes in the same chapter and related chapters.'"[21] But it asks us to do more than read Utah Code section 10-2-421 in harmony with related chapters. The District asks us to read additional requirements, based on an implied legislative intent, into section 10-2-421 that are not written in any of the statutes it cites. This court "look[s] to intent only if we conclude the statute's language is ambiguous."[22] The District has failed to show that the meaning of section 10-2-421 is ambiguous, so we decline to analyze the Legislature's intent, and resolve this conflict based on the plain language of the text.

¶32 The District argues that three statutes contradict the interpretation of sections 10-2-421 and 10-4-81 outlined above, and together dictate that the Cities are not free to provide electric services in annexed areas of the District, even if proper reimbursement is paid. Underlying the District's argument about each of the three provisions is a broader policy argument—that Utah Code section 10-2-421 must not mean what it says it does, because other statutes show the Legislature intended to protect the financial obligations of improvement districts. But the statutes it cites do not address the issue at hand—provision of electric service to former District customers by an annexing municipality. We address each of the statutes in turn, explaining why they, individually and collectively, do not change the plain reading of section 10-2-421.

### A. Utah Code Section 10-2-420 Addresses Requirements for Annexation, Not the Provision of Electric Service

¶33 The first statute the District contends contradicts our reading of section 10-2-421 is Utah Code section 10-2-420, which

---

[21] (Quoting *Thomas Edison Charter School v. Retirement Bd.*, 2008 UT App 221, ¶ 11, 189 P.3d 79.)

[22] *In re Adoption of Baby E.Z.*, 2011 UT 38, ¶ 21, 266 P.3d 702.

S. Utah Valley Elec. Serv. Dist. *v.* Payson City

Opinion of the Court

establishes protection for bonds and bondholders. But under the plain text of section 10-2-420 there is no conflict between the two provisions.

¶34 Utah Code section 10-2-420(1) states, "A boundary adjustment or annexation under this part may not jeopardize or endanger any general obligation or revenue bond." But the District is not arguing to stop annexation of parts of its service area—the annexations have already taken place. Rather, the District infers from this section a general intent to provide protection to bonds and bondholders. We agree with the District that the statute shows a legislative concern with bonds and bondholders, but the Legislature chose to address that concern by setting a condition for annexation— not the provision of electric services following annexation. Section 10-2-420 may have given the District grounds to protest annexations in its service area, but it says nothing about what happens following annexation.

### B. *Utah Code Section 10-2-428 Does Not Address the Ability of the Municipality to Provide Electric Service*

¶ 35 Next, the District argues that Utah Code section 10-2-428, and its counterpart, Utah Code section 17B-1-502(1)(a), demonstrate that an annexing municipality cannot provide electric service within the District without going through the Title 17B withdrawal procedures, which are found in Utah Code sections 17B-1-501–513. These sections set forth the requirements for residents to petition for areas in which they live to be withdrawn from special districts— including electric improvement districts. But section 10-2-428 does not speak to the provision of electric services when a municipality overlaps with an electric improvement district—it addresses only the process necessary to change the boundaries of an electric improvement district.

¶ 36 Utah Code section 10-2-428 states that

> Except as provided in Section 17B-1-416 and Subsection 17B-1-502(2), the annexation of an unincorporated area by a municipality or the adjustment of a boundary shared by municipalities does not affect the boundaries of a local district under Title 17B, Limited Purpose Local Government Entities--Local Districts, or a special service district under Title 17D, Chapter 1, Special Service District Act.

According to the District, this means that the Cities cannot provide electric service within the District without going through Title 17B

withdrawal procedures. Specifically, the District notes that Title 17B allows for automatic withdrawals by annexing municipalities when special districts had been providing law enforcement or emergency response services but does not include automatic withdrawal for electric improvement district service areas.[23]

¶ 37 The plain text of section 10-2-428 speaks only to the changing of boundaries and says nothing about the provision of electric services within those boundaries. This is particularly apparent because the Legislature has, in the same chapter, addressed that exact issue. Section 10-2-428 does not need to provide for automatic withdrawal of parts of electric improvement districts annexed by municipalities, because section 10-2-421 already establishes the process for an annexing municipality to take over electric service from electric improvement districts.

¶ 38 There is no dispute between the Cities and the District about the boundaries of the District. The issue is whether or not the Cities can provide electric service following annexation within the District's boundaries. The plain text of section 10-2-428 does not speak to this issue, and we decline to read any additional requirements into it.

    *C.    The Title 17B Withdrawal Procedures Are Separate and*
*Apart from the Requirements for Provision of Electric Service*

¶ 39 Building off its argument based on section 10-2-428, the District argues that the Title 17B withdrawal procedures show what the Cities must do to begin providing electric service within the District. The District argues that the enactment of the Uniform Withdrawal Procedures for Special Districts Act, Utah Code sections 17B-1-501–513, "could fairly be considered a legislative reaction to [*Strawberry*]," creating more stringent requirements for the Cities to provide electric service within the District.

¶ 40 Withdrawal is a process by which landowners, residents, the board of trustees of a local district, a municipality, or a county may petition to have an area removed from a local district,[24] so that once withdrawn, the area will no longer be considered within the district's boundaries.[25] A municipality can petition for withdrawal only after

---

[23] *See* UTAH CODE § 17B-1-502(2).

[24] The District is an electric improvement district, which is a type of local district.

[25] UTAH CODE § 17B-1-504.

S. Utah Valley Elec. Serv. Dist. *v.* Payson City

Opinion of the Court

receiving "a written request . . . signed by registered voters residing within the boundaries of the area proposed for withdrawal equal in number to at least 51% of the number of votes cast in the same area for the office of governor at the last regular general election."[26] Once a petition has been properly filed, Utah Code sections 17B-1-508–509 outline notice and public hearing requirements that vary based on the type of local district and the party bringing the petition. Following the completion of notice and hearing requirements, the board of trustees for the local district must either approve or deny the petition for withdrawal.[27] Utah Code section 17B-1-510(3) lists mandatory reasons for denial of withdrawal petitions, including denial of withdrawals that "would adversely affect the ability of the local district to make any payments or perform any other material obligations under . . . any of its notes, bonds, or other debt or revenue obligations" or "materially impair the operations of the remaining local district." According to the District, the Legislature's enactment of these uniform withdrawal procedures reveals the Legislature's intent to depart from *Strawberry*.

¶ 41 But "[i]n the absence of express statutory language to the contrary, we do not presume that the legislature . . . intended to overrule the prior decisions of this court."[28] And there is a key provision missing from the Title 17B withdrawal statutes that is necessary for the District's argument to succeed. Nowhere in Utah Code sections 17B-1-501–513 does any statute say that the District is the exclusive provider of electricity in its boundaries unless an area is withdrawn. Sections 17B-1-501–513 describe in detail the steps required to withdraw an area from a local district, but say nothing about the ability of a municipality to provide electricity to an area that has not been withdrawn. It also seems unlikely that the Legislature would use the uniformization of withdrawal procedures to overturn *Strawberry*, rather than simply amending the statute the *Strawberry* Court relied on—section 10-2-421.

¶ 42 Allowing the Cities to serve former District customers in annexed areas after complying with Utah Code section 10-2-421 does not render the Title 17B withdrawal procedures meaningless. The Title 17B withdrawal procedures create a path for residents to

---

[26] *Id.* § 17B-1-504(1)(a)(iv).

[27] *Id.* § 17B-1-510.

[28] *Bradley v. Payson City Corp.*, 2003 UT 16, ¶ 18, 70 P.3d 47.

withdraw from local districts on their own initiative—unlike section 10-2-421, which is only triggered by annexation.[29] And the Title 17B withdrawal procedures apply to all local districts,[30] including, for example, irrigation districts,[31] mosquito abatement districts,[32] and water conservancy districts.[33] Section 10-2-421 does not impact the majority of local districts—it narrowly applies to electric improvement districts.

¶43 The District has presented no reasonable interpretation of the plain text of section 10-2-421 that harmonizes with its interpretation of Title 17B. If the District were correct that withdrawal is a prerequisite to the provision of electric services by an annexing municipality, then there would be no reason for the Legislature to specifically provide a different resolution to the same issue under section 10-2-421. The requirements for withdrawal are significantly more burdensome under Utah Code sections 17B-1-501–513 than the requirements listed in section 10-2-421. And when a specific statute conflicts with a more general provision, courts typically follow the directions of the more specific statute because "the specific provision comes closer to addressing the very problem posed by the case at hand and is thus more deserving of credence."[34] Because Title 17B speaks only to the general requirements for withdrawal, without addressing the provision of electric services by an annexing municipality, we will not infer that Title 17B overrules the specific requirements set out in section 10-2-421.

---

[29] *See* UTAH CODE § 17B-1-504(1)(a)(i)–(ii) (allowing "owners of private real property" or "registered voters residing within the area" to initiate the withdrawal process).

[30] *See id.* § 17B-1-504(1) (referring to "withdraw[ing] an area from a local district"); *id.* § 17B-1-102(13) (defining "local district").

[31] *See id.* § 17B-1-102(13)(b)(ii)(E).

[32] *See id.* § 17B-1-102(13)(b)(ii)(G).

[33] *See id.* § 17B-1-102(13)(b)(ii)(J).

[34] ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 183 (2012).

S. Utah Valley Elec. Serv. Dist. *v.* Payson City

Opinion of the Court

**Conclusion**

¶44 Because the district court correctly interpreted the statutes at issue, we affirm its decision.

———————